**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

AMBER GORDON

           Plaintiff,

        v.

LA SALLE UNIVERSITY

           Defendant.

Civil Action No:  14-cv-3056-LFR

## <u>ORDER</u>

AND NOW, this _____ day of _____, 2015, upon consideration of Defendant La Salle University's Motion to Exclude the Report of John W. Dieckman from evidence at trial, and any response thereto, it is hereby ORDERED and DECREED that said Motion is GRANTED.

BY THE COURT:

_____
                             Restrepo, J

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

AMBER GORDON

        Plaintiff,

        v.

LA SALLE UNIVERSITY

        Defendant.

Civil Action No:  14-cv-3056-LFR

## DEFENDANT LA SALLE UNIVERSITY'S MOTION TO EXCLUDE
## THE REPORT OF JOHN W. DIECKMAN

Defendant La Salle University, by counsel, hereby moves this Court to exclude from evidence at trial Plaintiff's proffered expert report concerning alleged earning loss of Plaintiff, authored by John W. Dieckman.  In support of this Motion, La Salle University relies upon and incorporates the accompanying Memorandum of Law.

Dated: January 23, 2015

/s/ J. Boughrum
Daniel P. O'Meara (PA ID 53535)
Jonathan Boughrum (PA ID 91019)
Chad A. Flores (PA ID 310610)
Montgomery McCracken Walker & Rhoads LLP
123 South Broad Street, 28th Floor
Philadelphia, PA 19109
Telephone: (215) 772-1500
Fax: (215) 772-7620
domeara@mmwr.com
jboughrum@mmwr.com
cflores@mmwr.com
*Attorneys for Defendant*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

AMBER GORDON

        Plaintiff,

      v.

LA SALLE UNIVERSITY

        Defendant.

Civil Action No:  14-cv-3056-LFR

---

### DEFENDANT LA SALLE UNIVERSITY'S MEMORANDUM OF LAW
### IN SUPPORT OF DEFENDANT'S MOTION TO EXCLUDE
### THE REPORT OF JOHN W. DIECKMAN

Defendant La Salle University ("La Salle") submits this Memorandum of Law in Support of its Motion to Exclude the Report of John W. Dieckman ("Dieckman Report"), authored by Plaintiff's proffered expert witness John W. Dieckman.

**I.    INTRODUCTION AND BACKGROUND**

On May 30, 2014, Plaintiff filed a complaint against La Salle seeking relief for alleged violations of the Americans with Disabilities Act, Section 504 of the Rehabilitation Act, and Breach of Contract (Dkt. 1).  Plaintiff filed her First Amended Complaint on September 30, 2014, with the substantive claims for relief unchanged (Dkt. 13).  Defendant filed its corresponding Answer and Affirmative Defenses on October 20, 2014 (Dkt. 17).  On January 9, 2015, the parties filed a Stipulation to Dismiss Count I of Plaintiff's First Amended Complaint (Dkt. 19).  This Court signed an Order dismissing Count I on January 9, 2015 (Dkt. 20).  Accordingly, the remaining claims are for those arising under Section 504 and breach of contract.

Plaintiff employed Mr. Dieckman to provide a vocational assessment and an analysis of alleged economic loss over the course of the Plaintiff's working life. The Dieckman Report (attached hereto as Exhibit "A") should be excluded because it is speculative, it ignores important relevant facts, and it asserts opinions that constitute improper legal conclusions.

## II.    STANDARD FOR ADMISSION OF WAGE LOSS EXPERT EVIDENCE

It is well-settled that the trial judge has broad discretion when deciding matters relating to the admission or exclusion of expert evidence. *First Nat'l State Bank of New Jersey v. Reliance Elec. Co.*, 668 F.2d 725, 731 (3d Cir. 1981). This Court may not admit expert evidence at trial unless it first determines that the proffered testimony is "not only relevant, but reliable." *Daubert*, 509 U.S. at 589; *see Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999) (district court's "gatekeeping obligation" under *Daubert* applies to "all expert testimony"). As the Third Circuit has observed, *Daubert* "direct[s] district court judges to perform a screening function, to ensure that evidence presented by expert witnesses is relevant, reliable, and helpful to the jury's evaluation of such evidence." *Elcock v. Kmart Corp.*, 233 F.3d 734, 744 (3d Cir. 2000) (Becker, C.J.) (citing *Daubert*, 509 U.S. at 597).

"Rule 702 embodies three distinct substantive restrictions on the admission of expert testimony: qualifications, reliability, and fit." *Elcock*, 233 F.3d at 741; *see also, e.g., In re TMI Litig.*, 193 F.3d 613, 662-65 (3d Cir. 1999). Rule 702 codifies the principles espoused by the Supreme Court in *Daubert*, *Kumho Tire*, and their progeny. Rule 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.

In the first instance, expert testimony should be excluded unless it is shown that the expert possesses sufficient specialized expertise in the relevant field. *See Elcock*, 233 F.3d at 741. Moreover, even if proffered expert testimony is not excluded for lack of adequate qualifications, the Third Circuit has made clear that the extent of the expert's qualifications is a factor that the district court should consider in evaluating the reliability of the expert's opinion under Rule 702. *See, e.g., id.* at 749.

Next, expert evidence may be deemed reliable only if it is grounded in the "methods and procedures of science" rather than mere "subjective belief or unsupported speculation." *Daubert*, 509 U.S. at 590. The Third Circuit has identified a number of factors potentially relevant to a district court's assessment of reliability:

> (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.

*In re TMI Litig.*, 193 F.3d at 664-65 (quotation omitted).

Finally, in determining whether proffered testimony satisfies *Daubert*'s "fit" requirement, the district court must decide whether the testimony "is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." *Daubert*, 509 U.S. at 591 (quoting *United States v. Downing*, 753 F.2d 1224, 1242 (3d Cir. 1985)); *see also General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert").

-3-

The party proffering expert testimony bears the burden of demonstrating "'by a preponderance of proof'" that the testimony at issue satisfies the requirements of Rule 702. *Oddi v. Ford Motor Co.*, 234 F.3d 136, 144 (3d Cir. 2000) (quoting *Daubert*, 509 U.S. at 593 n.10). This Court has broad discretion to exclude improper expert testimony under Rule 702 and the *Daubert* standard. *See, e.g., Joiner*, 522 U.S. at 142.

When an expert testifies as to ongoing wage loss, his opinions must be based on a firm factual foundation. *Gumbs v. International Harvester, Inc.*, 718 F.2d 88, 98 (3d Cir. 1983). A plaintiff's "personal belief" as to what she "could have earned" prior to an injury is not sufficient to form an opinion as to ongoing wage loss. *Id.* Further, an expert's unrealistic extrapolation of the plaintiff's future wages without any factual backing is similarly insufficient. *Benjamin v. Peter's Farm Condominium Ass'n*, 820 F.2d 640, 641 (3d Cir. 1987). This form of expert opinion must meet the requisite levels of proof in order to present an "accurate and complete appraisal" of the plaintiff's alleged future earnings and how her injury, if any, may impact them. *Heckman v. Federal Press Co.*, 587 F.2d 612, 618 (3d Cir. 1978). While this is a fact specific inquiry, the case law of the Third Circuit is clear that an economic expert must base his opinion regarding loss of future wages upon a firm factual foundation and that wild speculation will not be sufficient.

## III.   LEGAL ARGUMENT

This Court should exclude the Dieckman Report because the economic projections contained therein are based on speculation and fail to recognize relevant facts: the Dieckman Report fails to recognize that Plaintiff is presently not (and perhaps may never be) medically able to take part in ***any*** Master's Degree program; the Dieckman Report mistakenly assumes that Plaintiff would earn a higher salary if she becomes a Master's-level therapist; the Dieckman

Report ignores the possibility that Plaintiff may one day be medically able to return to the pursuit of her Master's Degree and that she will opt to complete that pursuit at another institution; and the Dieckman Report does not acknowledge that, assuming she is one day medically able, Plaintiff may take any number of alternate educational paths, leading to any number of employment and earning opportunities. Moreover, the Dieckman Report completely ignores Plaintiff's own sworn statements regarding her complete disability and inability to work or earn any income. Finally, the Dieckman Report sets forth assertions that constitute improper legal conclusions.

### A.   The Report is Based on Speculation and Fails to Consider Relevant Facts as Required by *Daubert* and Rule 702.

The opinions and assertions set forth in the Dieckman Report regarding Plaintiff's supposed lifetime lost earnings are speculative, contradictory, and lack firm factual foundation. Mr. Dieckman opines in his Report that Plaintiff has and will continue to suffer an annual salary loss of $21,370, the difference between the average salary of a counselor with a Master's Degree in Marriage and Family Therapy ($64,280) and the average salary of other types of counselors and mental health workers ($42,910). (Dieckman Report at 17.) Mr. Dieckman then calculates Plaintiff's total future loss of earnings as $860,997, representing 40.29 years of expectant work life. (Dieckman Report at 18.) An examination of the record as well as deposition testimony given by Mr. Dieckman reveals the lack of factual foundation and the speculation on which the Report is based. (The transcript of Mr. Dieckman's deposition is attached hereto as Exhibit "B.")

To begin, the Dieckman Report fails to take into account the ever-changing and highly uncertain nature of the Plaintiff's medical condition and instead makes assumptions regarding same. Further, the Dieckman Report fails to account for the fact that Plaintiff is not presently

able to work or attend school, and will likely not be able to do so for ***at least*** one year. [1]

(Dieckman Dep. 17:10-16; 19-20:22-8.)  Indeed, no one knows when – ***if ever*** – Plaintiff will be

medically able to attend school or engage in work.  As a result, Dieckman's opinion that Plaintiff

is presently suffering wage loss (Dieckman Report at 18) is false; a fact Dieckman admits.  *See*

note 1, *supra.*  As a result, the Dieckman Report's conclusions about present and future wage

loss are not reliable.

Likewise, the Dieckman Report fails to acknowledge that, in the event that Plaintiff's

health permits her to one day continue her education, she could do so at another institution, and

that such a degree "could lead to any level of future income . . . " and no wage loss. (Dieckman

Dep. 17:3-9.)  While not provided for in the Report, Dieckman admitted this point in his

deposition. (Dieckman Dep. 14:2-10) (Q: Isn't it also true that if [Plaintiff] were to obtain a

Master's Degree from another university, she would not obtain that loss or she would not suffer

that financial loss?  A: if she were . . . capable of going on to pursue another Master's Degree . . .

she would have no wage loss.")  Dieckman admits that Plaintiff may never actually suffer a wage

loss.  As a result, Dieckman's opinion that Plaintiff has and will continue to suffer a wage loss is

false and purely speculation.

Similarly, the Dieckman Report acknowledges that there is no guarantee that Plaintiff

will earn the higher salary attributed by Dieckman to a Master's-level therapist.  Dieckman's

---

[1] Q: And given the difficulties [Plaintiff] is currently suffering with her Lyme disease and based on the information
you've just cited from her doctors, you would agree with me that [Plaintiff] isn't currently suffering an earnings loss
because she couldn't complete the Master's program at this time?
A: Correct.
Q: And you would agree . . . that it might be more than a year, the reality might be that this Lyme disease is never
sufficiently treated to the point where [Plaintiff] can go forward, finish her Master's Degree and earn that income,
correct?
A: Well, all I can say is that the medical information from her treating physician is that it could be corrected within a
year.

wage loss calculation is based on the difference between an earnings average of $64,280 for a Master's-level therapist and $42,910 for a non-Master's-level therapist. The Dieckman Report and deposition testimony, however, specifically acknowledge that even with a Master's degree, Plaintiff may earn only $41,000. (Dieckman Report at 17) ("In my presence, Amber Gordon contacted several of her friends who are successful in completing the Master's program to determine their salary range. . . [A] friend at the Penn Foundation has recently become an employee at a salary of $41,000 annually plus benefits."); (Dieckman Dep. 38:2-6) ("It's a point that [Plaintiff's Masters-level earnings] could be as low as $41,000 . . . ."). Accordingly, the Dieckman Report actually demonstrates that Plaintiff may suffer no actual wage loss due to the lack of a Master's degree.

Moreover, neither Dieckman nor Plaintiff has any idea what educational and/or professional opportunities Plaintiff may pursue in the future. In his deposition, Mr. Dieckman acknowledged that Plaintiff may undertake a variety of differing educational and career paths, all of which would result in different salary projections. (Dieckman Dep. 28:19-22.) (Q: And as we said before, there's no telling what additional education or job opportunities [Plaintiff] may pursue in the future? A: That's correct.); (Dieckman Dep. 17:3-9) (Q: And it's true that [Plaintiff] could pursue a different career course and educational path at a different university, correct? A: Oh, it's possible. Q: And that could lead to any level of future income, correct? A: It's possible, yes.). The fact is Mr. Dieckman has no idea what Plaintiff's future earnings may be.

This Court should exclude the Dieckman Report from evidence at trial because the opinions contained therein regarding Plaintiff's supposed lost earnings are speculative, contradictory, and lack firm factual foundation as required by *Daubert* and Rule 702.

**B.**      **The Report Ignores Plaintiff's Own Sworn Statements Regarding Her Total**
           **Disability and Inability to Work**

On July 25, 2013, Plaintiff applied for disability benefits under the Social Security Act

("SSD Benefits"), wherein she swore before the United States government, under penalty of

criminal prosecution, that she "became unable to work because of [her] disabling condition on

June 1, 2012," one year and seven months prior to her ultimate dismissal from La Salle's

Marriage and Family Therapy Master's Degree Program.  (SSD Application Summary at 1-2.)

(The SSD Application Summary is attached hereto as Exhibit "C.")  In order to project Plaintiff's

future lost earnings, the Dieckman Report assumes Plaintiff's ability to work—in spite of her

own sworn statements to the contrary.

The Dieckman Report attempts to calculate Plaintiff's supposed annual loss of earnings

from present until the date she is eligible to retire (40.29 years) as a result of her dismissal from

La Salle's Master's Degree Program.  The Dieckman Report blindly assumes Plaintiff's ability to

work and bases the earning loss estimation on that assumption, despite the fact that Plaintiff

herself has sworn to the United States government that she in unable to work.  Mr. Dieckman has

acknowledged the apparent incongruity.  At his deposition, when asked if "there is a conflict

between being gainfully employed as a Master's level therapist and receiving [disability

benefits]," Mr. Dieckman replied "Yes, correct, she would not be able to do both."  (Dieckman

Dep. 24:8-11.)

Plaintiff has sworn that she has been unable to work since 2012 and, without further

examination and investigation by Plaintiff's treating physicians, Mr. Dieckman has no way of

determining when Plaintiff will be able to work and thus has no basis on which to predict loss of

earnings.  La Salle requests that this Court exclude the Dieckman Report on this basis.

C.     **The Report Sets Forth Assertions that Constitute Improper Legal Conclusions**.

The Dieckman Report should be excluded pursuant to Federal Rule of Evidence 702 because it contains improper legal conclusions. It is axiomatic that "an expert witness is not permitted to express legal conclusions." *McCrink v. Peoples Benefit Life Ins. Co.*, No. 2:04-CV-01068-LDD, 2005 WL 730688, at *4 (E.D. Pa. Mar. 29, 2005) (excluding expert testimony on the issue of contract construction because the expert report was "littered with impermissible legal conclusions") (citing Fed. R. Evid. 704(a)). Similarly, in *Fellheimer v. Fairmont Hotels & Resorts, Inc.*, No. CIV.A.03-1677, 2004 WL 2278533, at *4 (E.D. Pa. Oct. 11, 2004), the court, in granting defendant's motion for summary judgment, refused to consider an expert report proffered by the plaintiff which contained a conclusion as to the liability of the defendant. As the court stated, "it is not permissible for a witness to testify as to the governing law since it is the district court's duty to explain the law to the jury." *Id. See also Pasteur v. Simon*, No. CIV.A. 98-727, 2005 WL 1993748, at *1 (E.D. Pa. Aug. 16, 2005) (granting motion to strike in part and ordering experts not to testify to the legal conclusions expressed in expert report).

The Dieckman Report contains an analysis and interpretation of Section 504 of the Rehabilitation Act and the Americans with Disability Act, thereby intruding upon the province of this Court to explain the law to the jury. *See Fellheimer*, 2004 WL 2278533 at *4; *see* Dieckman Report at 14-16. Second, the Report contains Mr. Dieckman's conclusions relating to La Salle's responsibilities under the law. *Id.* at 16. Once again, it is the duty of this Court to explain the law and La Salle's responsibilities under the law. *See Fellheimer*, 2004 WL 2278533 at *4. Third, the Dieckman Report includes legal conclusions, which further serve to usurp the requisite judicial responsibility and role of the jury in this case. For example, the Dieckman Report states, "[Plaintiff] has asked LaSalle University [sic] for a medical leave, which is a reasonable

-9-

accommodation under section 504 of the Rehabilitation Act as well as the Americans with

Disabilities Act. LaSalle University [sic] has failed to grant this and instead dismissed her from

the program." (Dieckman Report at 18.) In deposition, Mr. Dieckman continued to set forth

conclusions of law, stating, for example, "So my belief and the assumption behind this entire

lawsuit is that La Salle has an obligation to do this, which they have not fulfilled." (Dieckman

Dep. 25:4-7.) These opinions clearly constitute improper legal opinions in violation of Rule 702,

and should be excluded from evidence at trial.

## IV.   CONCLUSION

For the reasons set forth above, this Court should exclude Mr. Dieckman's Report as it

does not meet the Fed. R. Evid. 702 or *Daubert* requirements, and it seeks to interfere with the

proper role of the Court and the jury in this case.


Respectfully submitted,

Dated: January 23, 2015

/s/ J. Boughrum_____
Daniel P. O'Meara (PA ID 53535)
Jonathan Boughrum (PA ID 91019)
Chad A. Flores (PA ID 310610)
Montgomery McCracken Walker & Rhoads LLP
123 South Broad Street, 28th Floor
Philadelphia, PA 19109
Telephone: (215) 772-1500
Fax: (215) 772-7620
domeara@mmwr.com
jboughrum@mmwr.com
cflores@mmwr.com
*Attorneys for Defendant*

## EXHIBIT A

Dieckman Report

PROTO-WORX

Disability Management Specialists

**Michael D. Raffaele**
**Of Counsel**
**Frankel & Kershenbaum, LLC**
*Lawyers for Kids and their Families*
**1230 County Line Road**
**Bryn Mawr, PA 19010**

**REFERENCE:**    **Amber Gordon v. LaSalle University**
**PROTO-WORX #: L1305**
**NO.**                     **214-cv-03056-LFR**

## VOCATIONAL ASSESSMENT

## AND

## ANALYSIS OF ECONOMIC LOSS

**December 12, 2014**

**John W. Dieckman, MS, CRC, CDMSC**
**Assistant Vocational Director**

318 East King Street, Malvern, PA 19355 * Tel: 610-640-0727 * Fax: 610-640-3302

PROTO-WORC, INC.                                                    Amber Gordon
PROTO-WORX #: L1305                                          December 12, 2014

## OVERVIEW

This matter was referred for purposes of both a vocational assessment and
an assessment of economic loss sustained by Amber Gordon when she was
dismissed from the Marriage and Family Therapy program at LaSalle University
in January, 2014. Ms. Gordon believes that her disability should have been
accommodated consistent with the Americans with Disabilities Act and section
504 of the Rehabilitation Act of 1973. Rather than accommodating her, LaSalle
University has dismissed her from the program. This action has resulted in
significant personal and financial loss for Ms. Gordon as detailed below.

For purposes of this assessment, I reviewed several medical and related reports,
as well as emails, all cited below.  I was also able to conduct an interview and
assessment with Amber Gordon.  The interview took place on 12/04/2014 at her
parents' home in Souderton, PA.

## INITIAL IMPRESSION

Amber Gordon is a 26-year-old (DOB 3/29/1988) woman who appears her
stated age. During the interview, she was appropriate, demonstrating excellent
communication skills consistent with her educational and vocational history. She
is actively treating for her illnesses as referenced below and was in the
process of traveling to one of her physicians following our interview.

## FAMILY/ ENVIRONMENT

Amber has lived on her own since becoming a student at Chestnut Hill College.
At the time of my interview she was living with three other individuals, but has
plans to move out within several weeks due to a lack of income. She uses her
parents' address as her permanent address. She plans to move to Bethlehem
where she has been offered a room in a friend's house. This will allow her to be
close to the physician she needs to see 2-3 times per week as noted below.

She does have a valid driver's license and access to personal transportation.
However, she is quite limited in her driving as the result of numerous surgeries
and orthopedic issues with her left upper extremity. According to the medical
report of A. Lee Osterman, M.D. dated 3/11/2013, she should limit her driving to
under 30 minutes.

She has no criminal history.

PROTO-WORC, INC.                                          Amber Gordon
PROTO-WORX #: L1305                                    December 12, 2014

## FINANCES

Amber Gordon reports that she has no income at present. She is not eligible
for Social Security Disability as she does not have the requisite history of
contributions. She is, however, eligible for SSI, and she has applied for this
benefit. Her initial application has been denied and she is appealing this
determination.

## ATTITUDES

Amber Gordon stated emphatically that the result that she would like to see from
this action is to receive her Master's Degree in Marriage and Family Therapy to
enable her to pursue a licensure and a career as a therapist or in a related field.
Without this degree, she will experience not only vocational limitations but also
significant financial limitations as documented below.

## MEDICAL

### Medical History

Amber Gordon's medical history here is well-known and will be repeated only in
brief.

Amber Gordon has a congenital birth defect which has resulted in significant
orthopedic malformation of her left arm. She described it as stating that her
entire upper left extremity is affected as the bones in her left arm are not
connected appropriately either to the wrist, to the shoulder or to each other.

As a child, she sought treatment at Shriners' Hospital until the age of 11 and
then transferred her treatment to Children's Hospital of Philadelphia (CHOP)
where she came under the care of Dr. Davidson. She had surgery at the age of
11 and wore an external fixator for 6 months while in 6th grade.

She stated that she is right-hand dominant by necessity but writes backward,
something more characteristic of left hand dominance. She demonstrated that
her left arm is several inches shorter than her right when extended.

After the initial surgery at CHOP, Amber began treatment at age 12 with Dr.
Osterman of The Philadelphia Hand Center for symptoms and pain that arose
after the initial surgery. Dr. Osterman has performed numerous surgeries
(she has had 7 major surgeries and several minor surgeries on her left upper
extremity). Her last surgery with Dr. Osterman occurred in 2009 immediately
after graduation from Chestnut Hill College. She had additional surgery to her
shoulder in December 2010 by Dr. Barbara Frieman of the Rothman Institute.

PROTO-WORC, INC.                                          Amber Gordon
PROTO-WORX #: L1305                                   December 12, 2014

Dr. Osterman has issued a medical report dated 10/31/2011 for light duty
restrictions for Amber Gordon. He specifically states, "Ms. Gordon has ongoing
restrictions related to work and use of her left arm as follows: no repetitive/
assembly-line type work – self-paced; driving not greater than 30 minutes
continuous; no lift/push/pull greater than 10 pounds."

Dr. Osterman has authored a letter dated March 11, 2013 directed to Ms. Rose
Pauline, Director of Disability Services at LaSalle University. That document reads
as follows:

> This letter is regarding Amber Gordon who has been under my care and
> underwent multiple surgeries relative to congenital abnormalities of the
> left upper extremity.
>
> Ms. Gordon initially came under my care in 2001 and since that time
> has had multiple operative procedures. She does have some residual
> problems related to the left arm including limited function and neuropathic
> pain. As a result over the years she has had various restrictions which
> would be permanent in nature. I have recommended that any work she
> does be self-paced and not repetitive or assembly line work. I also have
> recommended not lifting anything greater than 10 pounds and limiting her
> driving to 30 minutes.
>
> It is noted that she has neuropathic pain associated with this which tends
> to be worse at night and in the morning. For this reason as well, I would
> request that reasonable accommodations be made in regard to her clinical
> responsibilities. Since some of her pain can be worse in the morning, I
> believe it would be beneficial for her to have clinical responsibilities in the
> later afternoon or evening if possible.

At age 15 or 16, Amber Gordon was diagnosed with Lyme disease and received
two weeks of antibiotic therapy. Amber had a tick attachment with a resultant
EM rash in 2009 and was again tested, diagnosed and treated with a short round
of antibiotics for Lyme disease. Amber reports that she assumed the treatment
prescribed by her physicians had sufficiently treated the medical diagnosis.

However, she has had numerous medical conditions which she now understands
are the result of chronic Lyme disease and Lyme co-infections. She has been told
that she will never be without Lyme infection, although remission is possible.

She experienced gastrointestinal illness in the fall of 2011. At that time, she was
under the care of Keith Kearney, D.O. of Bux-Mont Gastroenterology Associates.
This physician wrote a note on 10/20/2011 asking that she be excused from

PROTO-WORC, INC.                                          Amber Gordon
PROTO-WORX #: L1305                                  December 12, 2014

work and school due to G.I. illness. There is also a prescription from Grandview
Medical Practices dated 11/3/2011 indicating that "Ms. Gordon will need to
suspend her internship until further notice" as she is dealing with "medical issues
and testing."

She experienced significant pain which she stated was related to her gallbladder.
Therefore, she sought out medical treatment at Abington Hospital where Seth
Newman, M.D. removed her gallbladder in November 2011. Amber Gordon
reports to me that her gallbladder was encased in scar tissue, which Dr. Newman
opined was the result of chronic inflammation of an unknown etiology. It is now
known that the tick-borne diseases were the underlying cause of the chronic
inflammation.

These symptoms and the surgery caused her to terminate the internship in which
she was participating at Crozier Chester Hospital as detailed below.

She has subsequently tested for Lyme disease. Although the test results were
noted to be positive in April, 2013, her personal physician encouraged her to
seek treatment from a Lyme literate physician. It wasn't until December, when
she was finally able to get an appointment with a Lyme literate physician, that
the Lyme disease and co-infections were "officially" diagnosed.

Amber Gordon tells me that the Lyme disease is now attacking her bladder,
for which she treats with an OB/GYN physician. She reports that she has been
diagnosed with interstitial cystitis/painful bladder syndrome for which she
treats with Dr. Howard Horne, an OB/GYN neurologist, of St. Luke's Hospital in
Bethlehem.

She has also been diagnosed with ovarian cysts and gastrointestinal issues
related to food allergies and stress. She reports that she was hospitalized on
one occasion and treated in the emergency room on several occasions for a
weakened immune system that has left her prone to infection.

As a result of the Lyme's disease, she does have difficulty with fatigue, insomnia,
pain and concentration issues. She tells me that these issues are not related to
the orthopedic issues involving her left upper extremity. She states that she was
managing these issues with a combination of homeopathic remedies including
meditation, massage and acupuncture. All of her pain is directly related to the
Lyme disease diagnosis, for which she takes numerous medications including
pain medication.

**Current Treatment**

Amber Gordon treats with a number of physicians at present.

PROTO-WORC, INC.                                                    Amber Gordon
PROTO-WORX #: L1305                                         December 12, 2014

She sees Howard Horne, M.D. of St. Luke's Hospital in Bethlehem several times
per week at present. She either receives rides to Bethlehem or will stay overnight
with a friend, rarely making the trip in one day. Dr. Horne has performed many
one-day procedures including cystoscopic and distention procedures of the
bladder and related treatment. He has catheterized her several times and injects
steroids into the bladder wall. She is scheduled to undergo a hysteroscopy for
uterine polyps on 1/22/2015. She has been treating with this physician since
spring, 2014.

She also treats with a pain management physician, Kerin Slevin, M.D., whom
she has seen "on and off for years." This physician prescribes muscle relaxers
and appropriate pain medication as well as administering Botox injections to the
neck, arm and shoulder. She sees him every 3-4 months in the winter, as her
condition is exacerbated by cold. Generally, she can "make it through summer
okay" by participating in a program of homeopathic medicine, yoga, stretching,
meditation and vitamin/supplement therapy.

Amber Gordon continues to treat with Dr. Osterman whom she sees
approximately every year. She will see him more often if it is a year involving
surgery. He has fused her left wrist and she reports that the physician intends
to fuse the ulnar and radial bones of her left arm, which are not currently
connected. She will eventually need a replacement surgery for her elbow as well
as her shoulder but this is not anticipated in the near future.

Ms. Gordon also treats with Barbara Frieman, M.D. of the Rothman Institute
who consults on her shoulder and elbow issues. This physician has also provided
injections for her left upper extremity.

Heidi Wittels, M.D. of Montgomery Rehab Associates provides medical
management for nutrition and gastrointestinal issues and currently for her Lyme
disease. Amber Gordon has a PICC line to accept IV medication as she has
difficulty with oral medications because of gastrointestinal issues. Ms. Gordon
has just finished a concentration of antibiotics (Doxycycline, Zithromax and
Rocephin) which started in July, 2014. She will continue undergoing testing to
determine if this has abated her Lyme disease. She tells me that she treats in
cycles with Dr. Wittels, depending upon the symptoms of her Lyme disease,
which is occasionally dormant but can morph into very different forms.

Dr. Wittels addressed a correspondence to the Student Progress Evaluation
Committee (SPEC) dated 1/14/2014. That correspondence/medical report reads
in part as follows:

PROTO-WORC, INC.                                            Amber Gordon
PROTO-WORX #: L1305                                  December 12, 2014

Separate from Amber's orthopedic condition, she was recently diagnosed
with and began treating with Dr. Wittels for a condition that explains the
myriad of symptoms she has been experiencing over the past several
years. Amber had previously treated with Dr. Wittels up until 2012 for
significant gastrointestinal symptoms that likely were symptoms of this
condition; however, at that time the pieces had not come together for a
definite diagnosis. It has been confirmed and she is being treated as of
December, 2013 for Chronic Lyme Disease and Lyme co-infections.

The symptoms Amber has experienced are classic for this diagnosed
condition including fatigue, gastrointestinal dysfunction and immune
suppression. The symptoms would have had an effect on her ability to
function at a high energy level on a consistent and sustained basis. Amber
made me aware she was in school and emphasized the importance of her
being able to finish this year. With that we tempered her treatment so she
could remain in school.

Once full treatment for this condition is begun it can take up to a year
before the patient can resume normal activities as the treatment can often
make the patient more debilitated before they get better. I fully anticipate
that once Amber has undergone treatment she will once again regain her
health and be able to return to the activities that have been affected by
her current condition.

Chronic persistent Lyme disease is also known as Multiple Systemic Infectious
Disease Syndrome (MSIDS). The medical literature suggests that this has
frequently been misdiagnosed as Fibromyalgia, ME/CFS, Musculoskeletal Disease,
Poly Myalgia Rheumatica and numerous other systemic diseases.

Amber Gordon also treats with Christine Gedorice, M.D. who consults on her
treatment with regard to Lyme disease.

Her primary physician is Rebecca Nice, D.O., who has authored a letter dated 3/
12/2013 regarding Amber Gordon. That letter reads in part as follows:

I am writing at the request of my patient, Amber Gordon, in order to
provide information regarding her diagnoses for her school's disability
office. I have been working with Amber since 9/4/2012 when she
established care with me. She has a history of numerous arm surgeries
due to a congenital birth defect and follows with numerous surgeons and
therapists. She has developed subsequent gastrointestinal disturbances in
her teen years and has seen gastroenterologists, nutritionists and other
therapists who performed biofeedback, massage and acupuncture.

PROTO-WORC, INC.                                    Amber Gordon
PROTO-WORX #: L1305                           December 12, 2014

She has endured many workups including imaging studies, endoscopies -and colonoscopies, all without definite diagnosis of her symptoms. She suffers from symptoms from Irritable Bowel Syndrome (IBS) which include nausea, vomiting, diarrhea, constipation, and abdominal pains which can be partially linked with food triggers as well as stress triggers which significantly impact her daily functioning.

## Medications

As the result of her medical conditions, Amber Gordon follows a regimented schedule for medications, supplements and treatments. She provided me with the following list of her scheduled intake:

**Before Food-**
Beyond Balance MC-BFM-1 1capsule - Serapeptase (Bioflims)
NET Remedy "ER 911" 12 squirts
Parsley 10 drops -detox
NET Remedy "Water" 12 squirts
Itires 20 drops -lymph drainage
NET Remedy "Scars and Adhesions" 12 squirts
NET Remedy "Wood" 12 squirts
L-Glutamine 1000mg
NET Remedy "Earth" 12 squirts
Resveratrol 200mg 1 tablet

**After Food-**
Vitamin D 50,000 IU 2x per week
Grapefruit Seed Extract 1capsule 250mg - Cyst buster
Chlorella 500mg 1tablet -Detox
Atarax 25mg -inflammation
Pyridium 200mg 1 tablet
Alpha Lipoic Acid 100mg

**Between Meals-**
Prescript-Assist Pro - Probiotic
Country Life B-Complex advanced
Sam-e 400mg
Atarax 25mg -inflammation
Zinc 20mg
Magnesium 667mg 3 capsules

**After Food-**
Fluconazole 150mg every other day - yeast prevention
Nystatin 500,000 units daily- yeast prevention
Atarax 25mg -inflammation
Pyridium 200mg 1 tablet
Alpha Lipoic Acid 100mg
Garlicin 350mg 2 tablets

PROTO-WORC, INC.                                    Amber Gordon
PROTO-WORX #: L1305                            December 12, 2014

**Between Meals-**
Bladder Ease 3 capsules -bladder inflammation
Curamon 3 capsules - inflammation
Vitamin C 1000mg
Co-Q10 100mg
Acetyl L- Carnitine 1000mg

**After Food-**
Detrol LA 6mg Antispasmatic for bladder
NET Remedy "ER 911" 12 squirts
Grapefruit Seed Extract 1capsule 250mg - Cyst buster
Sprintec -Birth Control/hormone regulation
NET Remedy "Water" 12 squirts
NET Remedy "Scars and Adhesions" 12 squirts
NET Remedy "Wood" 12 squirts
NET Remedy "Earth" 12 squirts

**Night Time-**
Zanaflex 4mg PRN Muscle Relaxer
Low Dose Naltraxone 4.5mg -Sleep
Neurontin- 300mg -lower back pain caused by bladder inflammation
Atarax 25mg -inflammation
Pyridium 200mg 1 tablet

**Detox-**
Alka-Seltzer GOLD
Bio-Mat
Epson Salt/Hydrogen Peroxide/Baking Soda Baths
Castor Oil (external)

**Medication Regime**

Detrol LA 4mg 1x (for overactive bladder)
Trazadone 50mg nightly (tetracyclic antidepressant)
Nystatin 500,000 IUs 1 daily (antifungal medication)
Sprintec 1x daily (combination hormone medication)
Pyridium 200mg 3x daily (for bladder control issues)
Zanaflex 4mg PRN (muscle relaxer)
Nucyenta 100mg PRN (to treat severe acute pain)
Zithromax IV  (antibacterial drug)
Meprone (treatment for Pneumocystis and related condition)
Flextor Patch 1.3% 1 patch nightly (for pain)
Nucyenta 100mg as needed for break through pain
Aderax 25mg 4x daily (for nausea and vomiting)
Diflucan 150 mg every other day (for fungal infections)
Glutathione 200mg IV 5cc in 10cc Saline every 3 days (for chronic fatigue and weakened immune
            system)

The medical literature lists multiple side effects and symptoms associated with
these medications including nausea, fatigue, vomiting, lethargy, loss of appetite,
irritable bowel syndrome, loss of concentration and numerous other symptoms.

PROTO-WORC, INC.                                          Amber Gordon
PROTO-WORX #: L1305                                    December 12, 2014

## Review of Records

Numerous records were reviewed, including but not necessarily limited to the
following:

Keith Kearney, D.O., medical note, 10/20/2011;
Tracy McGinley, CRNP, medical note, 10/26/2011;
Rebecca Nice, D.O., medical report/correspondence, 3/12/2013;
Rebecca Nice, D.O., medical report/correspondence, 1/15/2014;
A. Lee Osterman, MD, prescription/limitations, 10/31/2011;
A. Lee Osterman, MD, medical report/correspondence, 3/11/2013;
Heidi Wittels, M.D., medical report/correspondence, 1/14/2014;
Grand View Medical Practices, medical prescription, 11/3/2011;
LaSalle University transcript for Amber Gordon;
Numerous emails and responses from Amber Gordon to and from various
individuals including:
Dr. Donna Tonrey, director of the MFT program at LaSalle
        Barbara Santone, the field placement coordinator for the MFT program
        Rose Pauline
Dr. Moore, the Dean of students
Amber Gordon's correspondence to Student Progress Evaluation Committee,
        1/15/2014.

## VOCATIONAL

### Educational / Vocational History

Amber Gordon provided me with the following vocational and educational
history.

She is currently 26 years old. She graduated from North Penn High School,
taking some college-level courses while in high school. These were similar
to advanced placement courses but technically called "hybrid" courses. She
graduated in 2006.

While in high school, she worked as a mother's helper and babysitter in her
local community. She also worked as a receptionist and hostess at the William
Penn Inn in Montgomery County. She also worked part-time during the summer
as a receptionist for North Penn Volkswagen, recalling that she often worked
occasional nights and weekends.

She enrolled in Montgomery County Community College, where she completed
an Associates degree in Public Health Sciences in the year 2008.

PROTO-WORC, INC.                                        Amber Gordon
PROTO-WORX #: L1305                                 December 12, 2014

She transferred to Chestnut Hill College which offered her a partial scholarship
and also had a music program which included the harp, which she enjoyed
playing. In the summer of 2009, she completed her bachelor's degree in
psychology at Chestnut Hill College. While matriculating at that school she lived
off campus, claiming that she needed to be able to cook her own food because
of increasing gastrointestinal issues. She also needed solid sleep and therefore
did not want to be in a dormitory or with less serious roommates.

In the fall of 2009, she began matriculating at LaSalle College and enrolled in
the Marriage and Family Therapy (MFT) program. She attended school full-
time with the expectation that she would complete a 40 credit Masters program
in approximately 2 ½ or 3 years, including internship. While studying her
coursework, she lived in the Chestnut Hill area and took classes at the Plymouth
Meeting campus of LaSalle University. She completed her 40 credits and began
her internship which was intended to last for 3 semesters.

Because she had a bachelor's degree in psychology, Amber Gordon was qualified
to work as a TSS (therapeutic staff support, commonly called a "wraparound").
She worked in various assignments one-on-one with individuals with various
mental and psychological disabilities. She worked on call for a number of
agencies including CCRES, Educational Alternatives and Educational and
Behavioral Consultants. These are agencies which contract with the Montgomery
County Intermediate Unit providing services for individuals with disabilities.

Amber Gordon tells me that her assignments varied. She began work at CCRES
as an employee. Her salary was $12 per hour, by her recollection, but eventually
this position offered salary as much as $18-$22 per hour. Amber Gordon
generally worked while attending school since she had mostly night classes.
She often worked 2-3 days during the week while attending classes in the
evening. She provided services for many younger children attending preschool
both in their school environment and in their home environment. She gradually
terminated this work in order to actively engage in her internship.

She did tell me that she was selective in her ability to choose clients. Because
of the limitations of her left upper extremity, she avoided situations where she
would be responsible to restrain or otherwise interact physically with violent
clients.

Ms. Gordon spent considerable time trying to select appropriate internships,
conscious of the limitations offered by Dr. Osterman to limit her driving (30
minutes) and her lifting/pushing and pulling to 10 pounds. Her first internship in
the fall 2010 was at Crozier Chester Medical Facility, where she was often able
to travel with a friend who drove. At the time, she was living in Harleysville. She
worked in the outpatient adolescent unit with local children, many of whom had

PROTO-WORC, INC.                                          Amber Gordon
PROTO-WORX #: L1305                                   December 12, 2014

mental health issues.

She began experiencing significant symptoms in August 2010 and in October
2010 was diagnosed with gastrointestinal issues by Keith Kearney, D.O., who
wrote a note (10/28/2011) asking that she be excused from school due to G.I.
issues. That same facility authored a note dated 11/3/2011 indicating that "Ms.
Gordon will need to suspend her internship until further notice" as she is dealing
with medical issues.

Her gallbladder was removed at Abington Hospital in November of that year and
she found herself so far behind in hours for internship that she needed to forfeit
this internship. She explained that she could not drive immediately following
the surgery and could not convey a return date to her internship site. She spent
considerable time recovering from the surgery and tells me that she was still not
appropriately diagnosed with Lyme disease at this time.

Her symptoms improved somewhat and she began the internship process
again, applying to various sites. She was attempting to follow the prescriptions
of Dr. Osterman to limit her driving, since this is frequently painful. She also
was looking for evening hours, to compensate for her morning nausea and
adrenal issues resulting in low cortisol levels in the morning and higher levels
in the evening. She did find one site which was supposedly listed on a portal
of approved sites. That was Aldersgate in Bucks County. She moved to the
Warminster area, anticipating that she could begin again her internship at this
location. Unfortunately, she was told by the field coordinator Barbara Santone
that the site was not approved because there was "not enough opportunity for
systemic work" at this location. She lost a semester beginning in January, 2011
as a result of this decision.

Amber Gordon was able to find another site for internship, Lenape Valley, where
she could intern under an appropriate licensed therapist. She was to work at
a partial hospital program working with patients transitioning to a lower care
status. This involved group therapy and she was responsible to videotape
a systemic session involving more than 2 people. She completed the first
semester and received the necessary number of hours but did not meet all of the
family therapy requirements, since there was no licensed therapist overseeing
this work. She received an incomplete grade from LaSalle University for this
semester.

At Lenape Valley, she frequently worked full-time from 8 AM to 4 PM. She
experienced lateness and some absences because of symptoms of nausea,
fatigue and adrenal issues. She indicated that she had an excellent rapport
with her site supervisor, Christina White (now Christina Pfeiffer) and this was
understood in detail. However, she continued to experience symptoms including

PROTO-WORC, INC.                                                    Amber Gordon
PROTO-WORX #: L1305                                          December 12, 2014

lateness and fatigue causing her to doze off on two occasions. Subsequently, the internship site dismissed her in March 2013. Had this been successful she expected to graduate in May 2013.

At that point, Amber Gordon emailed Barbara Santone, the field placement coordinator for the MFT program (3/7/2013) indicating that she is struggling with chronic medical issues which was the reason why she had to leave the Chester Crozier facility and which has affected her internship at Lenape Valley as well. She questioned whether LaSalle University was willing to work with someone in her position to achieve her goals considering the sacrifices she had made for this program. She also contacted the disabilities department to help in creating a solution. In this email, she posed numerous questions including the effect of this action upon her graduation and her final exams. She inquired whether LaSalle would allow her to do some type of independent study to complete the program.

She was to be evaluated by the SPEC program and was told by email that this was a closed process and she was not allowed to represent herself.

Amber Gordon explained in her letter to the Student Progress Evaluation Committee that she was experiencing symptoms of extreme fatigue, pain, concentration issues and gastrointestinal issues. She also claimed that she was admitted to the emergency room 3 times and had emergency surgery to control the infection.

In that letter, she claims to have begun the process at the disabilities office at LaSalle University to determine her options with chronic health issues.

The SPEC committee provided her with a correspondence indicating that she would have to complete 2 semesters of internship and was placed on academic probation.

Amber Gordon began the internship process again and found a site, Rise Above, in King of Prussia PA where she initiated her internship in the fall of 2013. Her work consisted of providing outpatient counseling in a drug and alcohol program in cooperation with the Montgomery County probation program. She reports that she enjoyed this work tremendously but that it was very stressful. Her clinical work was strong but she fell behind with administrative duties such as charting, intake notes, therapy notes etc. Keeping up with administrative duties was further complicated by heavy snow and holidays. Amber offered to come in extra days to allow more time to complete administrative tasks.

At this time, her symptoms also increased significantly. She detailed these in her letter as "immune suppression, gastrointestinal issues, fatigue, adrenal issues, pain, headaches and cognitive impairments" which she attributed to her

PROTO-WORC, INC.                                                Amber Gordon
PROTO-WORX #: L1305                                       December 12, 2014

persistent and chronic Lyme disease. It was at this time in December 2013 that
she was diagnosed with Lyme disease by Heidi Wittels, M.D.

As Amber Gordon illustrates in her letter to the SPEC committee, she returned
from the holidays and was presented with concerns by her supervisor. She
disclosed her recent medical diagnosis but was asked to leave the site and could
not complete her internship there. At that time, she emailed Dr. Tonrey and
Barbara Santone to request a meeting to get treatment for her illness, which she
claims was finally diagnosed.

Ms. Gordon communicated by email with Dr. Donna Tonrey and Dr. Moore, the
Dean of students, requesting consideration in the form of medical leave. In her
email to Dr. Moore of 1/13/2014, she indicates that she has finally been given a
diagnosis of Multiple Systemic Infectious Disease Syndrome based upon positive
blood tests.

She made a request as follows: "I am asking my department to grant me
medical leave and allow me to come back after receiving treatment to finish any
unfulfilled requirements." She further indicated that she did not have sufficient
time to produce supportive documentation as illustrated in the email train with
Dr. Donna Tonrey, director of the MFT program at LaSalle.

She also sent an email to Dr. Donna Tonrey on 1/17/2014. That email asks that
she be granted "medical leave and the ability to complete when I am well." She
also offered documentation to support and substantiate this request for medical
leave.

There is a correspondence from Dr. Donna Tonrey dated 1/21/2014 as follows:
"in response to your request for a medical leave of absence, your request will
not be granted because it is untimely since you made the request after you
were terminated from your field placement, successful completion of which was
required for you to continue with the program."

With that, LaSalle University has terminated her matriculation at that university.

## Reasonable Accommodation

Section 504 of the Rehabilitation Act of 1973 is legislation that guarantees
certain rights to people with disabilities. Section 504 is widely recognized as the
first civil-rights statute for persons with disabilities. It took effect in May 1977.
Because it was successfully implemented over the next several years, it helped to
pave the way for the 1990 Americans with Disabilities Act.

Section 504 states (in part):

No otherwise qualified individual with a disability in the United States, as defined in section 705(20) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service.

According to this law, *Individuals with Disabilities* are:
"Persons with a physical or mental impairment which substantially limits one or more major life activities." "Major life activities include caring for one's self, walking, seeing, hearing, speaking, breathing, working, performing manual tasks, and learning."[1]

"For purposes of employment, *Qualified Individuals with Disabilities* are persons who, with *Reasonable Accommodation*, can perform the essential functions of the job for which they have applied or have been hired to perform."

"*Reasonable Accommodation* means an employer is required to take reasonable steps to accommodate [one's] disability unless it would cause the employer undue hardship."[1]
That is, *Qualified Individuals with Disabilities* must be able to perform the job duties associated with the job for which they would be hired. The USA Department of Labor also indicates that "Small Providers" do not have to make "*significant* structural alterations to their existing facilities" to accommodate the individual with the disability.

The broad reach of Section 504 is implied in the statutory language above. Section 504 covers "any program or activity receiving Federal Financial Assistance". Federal funds underwrite airports all over the country - it is no accident that airports were among the first American facilities to become fully accessible. Federal funds also flow to some 3,000 colleges and universities nationwide, typically in the form of grants and cooperative agreements, but also through financial assistance for students. Colleges, universities, and community colleges became accessible in the late 1970s and early to mid 1980s because of Section 504. Public libraries in many thousands of communities receive federal financial assistance, directly or indirectly. These, too, became accessible within just a few years of the implementation of section 504.

"The ADA (Americans with Disabilities Act) was passed in 1990, and seems to pick up where the Rehabilitation Act left off. Borrowing from the §504 definition of disabled person, and using the familiar three-pronged approach to eligibility (has a physical or mental impairment, a record of an impairment, or is regarded as having an impairment), the ADA applied those standards to most private sector businesses, and sought to eliminate barriers to disabled access in

PROTO-WORC, INC.                                              Amber Gordon
PROTO-WORX #: L1305                                     December 12, 2014

buildings, transportation, and communication.

The ADA is a wide-ranging civil rights law that prohibits discrimination based
on disability. It affords similar protections against discrimination to Americans
with disabilities as the Civil Rights Act of 1964, which made discrimination
based on race, religion, sex, national origin, and other characteristics illegal. In
addition, unlike the Civil Rights Act, the ADA also requires covered employers to
provide reasonable accommodations to employees with disabilities, and imposes
accessibility requirements on public accommodations.

Title II of the Americans with Disabilities Act prohibits discrimination against
people with disabilities by public entities. These provisions include publicly
funded educational institutions such as universities, colleges, and technical
schools. Privately funded educational institutions are subject to similar non-
discrimination requirements under Title III of the Act and employers are covered
under Title I. A major thrust of the ADA is to ensure that people with disabilities
gain access to the mainstream of American society. Access to education is one
key to opening the doors of mainstream society to people with disabilities.
*(http://www.imperial.edu/students/dsps/information-about-disabilities/facts-on-
the-ada-disability-and-accommodations/)*

Under the law LaSalle University has a responsibility to provide reasonable
accommodations for Amber Gordon in order to ensure that she is able to finish
her Masters degree in Marriage and Family Therapy. By definition, reasonable
accommodations are those steps to be taken to assist a student such as Amber
Gordon who meets the definition of individuals with disabilities. Unless LaSalle
University can demonstrate that they will experience significant hardship in
making such an accommodation, it is their legal responsibility to do so.

## Residual Employability/ Finances

Lacking an appropriate Masters degree, Amber Gordon will experience
considerable financial loss as the result of the failure of LaSalle University to
make reasonable accommodations for her disability.

Amber Gordon spoke of her long-range goal to potentially secure a doctorate
as a licensed therapist in the state of Pennsylvania. Her immediate short-term
goal was to find employment at an agency or private practice and to begin
employment as a therapist in marriage and family therapy.

If she were to have a Masters degree and 3000 supervised hours as a therapist
she could sit for a license to become a licensed family therapist in the state of
Pennsylvania. A license is not needed in order to practice as a therapist but it is
highly desired for individuals with professional ambition.

PROTO-WORC, INC.                                    Amber Gordon
PROTO-WORX #: L1305                          December 12, 2014

If she were to obtain a Masters degree in Marriage and Family Therapy, she would be eligible to work for an agency such as the Penn Foundation or Aldie Counseling, where she could be an employee or an independent practitioner charging a fee for service. In my presence, Amber Gordon contacted several of her friends who are successful in completing the Masters program to determine their salary range. One friend currently working in a fee-for-service capacity for Aldie Counseling is earning $28.75 per hour. Another friend at the Penn Foundation has recently become an employee at a salary of $41,000 annually plus benefits.

Without a Masters degree, Amber Gordon will be limited to work similar to what she has performed in the past. This includes work as a TSS (therapeutic staff support) person or a behavioral specialist consultant. She can also work as a mental health counselor or a general behavioral specialist, as a mental health substance abuse social worker/counselor or a community health worker. These are positions which average $42,910 annually in the local labor market.

According to the Bureau of Labor Statistics for the Philadelphia – Wilmington – Camden Metropolitan statistical area, for the year ending May, 2013, marriage and family therapists earned an average of $64,280 annually in the same labor market.

The difference between the average annual salary for an MFT therapist and the average earnings of other types of counselors and mental health workers is $21,370 ($64,280 -$42,910 = $21,370). This represents the annual loss of earning capacity suffered by Amber Gordon as a result of her failure to obtain a Masters degree from LaSalle University.

| Occupation Code | Occupation Title | Median Hourly | Mean Hourly | Mean Annual |
|---|---|---|---|---|
| 21-1013 | Marriage and Family Therapists | $30.39 | $30.90 | $64,280 |
| | | | | |
| 21-1094 | Community Health Workers | $18.18 | $19.96 | $41,520 |
| 21-1023 | Mental Health and Substance Abuse Social Workers | $19.86 | $20.59 | $42,830 |
| 21-1014 | Mental Health Counselors | $19.91 | $20.60 | $42,840 |
| 21-1019 | Counselors, All Other | $21.51 | $21.37 | $44,450 |

PROTO-WORC, INC.                                          Amber Gordon
PROTO-WORX #: L1305                                December 12, 2014

Source: Bureau of Labor Statistics for the Philadelphia – Wilmington – Camden
Metropolitan Statistical Area, May, 2013

Amber Gordon is currently 26.71 years of age, having been born on
3/29/1988. According to Social Security records, she is eligible for full
retirement at the age of 67, representing an additional 40.29 years of
expectant work life.

If she suffers an annual loss of earnings equivalent to $21,370, she will
in effect suffer a future loss of earnings of $860,997 ($21,370 x 40.29 =
$860,997).

This is a conservative figure in that it does not account for the value
of medical benefits. It is unknown whether Amber Gordon's future
employment will include medical benefits and therefore their value has
not been included. It also does not account for the increase in wages
and productivity normally associated with a career of more than 40
years.

## Conclusions

Amber Gordon was enrolled in the Marriage and Family Therapy program at
LaSalle University when she was experiencing medical issues which impacted
upon her ability to fully complete various internships. To her credit, she
attempted to intern at several different locations but was unable to do so for
medical reasons.

She has asked LaSalle University for a medical leave, which is a reasonable
accommodation under section 504 of the Rehabilitation Act as well as the
Americans with Disabilities Act. LaSalle University has failed to grant this and
instead dismissed her from the program.

Had she successfully completed the Masters program as a marriage and family
therapist, Amber Gordon could have obtained a license and theoretically could
have gone on to pursue a doctorate in this field. She no longer has this earning
capacity and has experienced significant financial loss as a result of these
University actions.

She is currently eligible to work in a variety of counseling and mental health
programs with average annual earnings of $42,910. This contrasts significantly
with her potential annual earnings as a marriage and family therapist, $64,280
according to the Department of Labor statistics. This represents an annual loss of
$21,370.

PROTO-WORC, INC.                                          Amber Gordon
PROTO-WORX #: L1305                                    December 12, 2014

Given her expectant remaining worklife of 40.29 years, Amber Gordon could
expect to realize a loss of as much as $860,997 over the course of her
professional career.

This is a conservative figure in that it does not include the value of increased
wages and future growth and does not account for the value of medical benefits.

It is my professional opinion that she has suffered a lifetime loss of earnings
equivalent to $860,997.

*Thank you for the opportunity to provide this evaluation.*

*All of my opinions have been expressed with a reasonable degree of professional
and vocational certainty.*

*I reserve the right to amend and change this opinion based upon any additional
medical or vocational information which is presented.*

Sincerely,

John W. Dieckman, MS, CRC, CDCMS
(Signed electronically)

John Dieckman, MS, CRC, CDCMS
Assistant Vocational Director

JWD/ddv

References:   *Dictionary of Occupational Titles, 1991.*

*May 2013 Metropolitan and Nonmetropolitan Area Occupational Employment and
Wage Estimates, Philadelphia-Camden-Wilmington, PA-NJ-DE-MD*

http://en.wikipedia.org/wiki/Section_504_of_the_Rehabilitation_Act

*(http://www.imperial.edu/students/dsps/information-about-disabilities/facts-on-
the-ada-disability-and-accommodations/)*

PROTO-WORC, INC.
PROTO-WORX #: L1305

Amber Gordon
December 12, 2014

**<u>EXHIBIT B</u>**

Dieckman Deposition

Case 2:14-cv-03056-JFL   Document 47-2   Filed 04/15/15   Page 35 of 51

JOHN W. DIECKMAN, MS, CRC
GORDON vs. LA SALLE UNIVERSITY

January 15, 2015
1–4

### Page 1

```
1              IN THE UNITED STATES DISTRICT COURT
2            FOR THE EASTERN DISTRICT OF PENNSYLVANIA
3                          - - -
4
      AMBER GORDON               :
5                               :
                                :
6         VS.                   :
                                : NO. 2:14-cv-03056-LFR
7                               :
      LA SALLE UNIVERSITY       :
8                               :
                                :
9                               :
10                         - - -
11              January 15, 2015
12                         - - -
13
14          Oral Deposition of JOHN W. DIECKMAN, MS, CRC,
15  CDMSC, taken pursuant to notice, held at the law office of
16  FRANKEL KERSHENBAUM, 1230 County Line Road, Bryn Mawr,
17  Pennsylvania 19010, on the above date, beginning at 9:38 A.M.,
18  before Margaret M. Kanyuk, R.M.R, R.P.R., Court Reporter and
19  Notary Public.
20
21                         - - -
22
23
24
```

### Page 2

```
1   APPEARANCES:
2
3
4           FRANKEL KERSHENBAUM
      BY:   DAVE FRANKEL, ESQUIRE
5           1230 County Line Road
            Bryn Mawr, Pennsylvania 19010
6           610-922-4200
            FAX 610-646-0888
7           dave@mykidslawyer.com
            Representing the Plaintiff
8
9
            MONTGOMERY McCRACKEN
10      BY:   JONATHAN P. BOUGHRUM, ESQUIRE
            123 South Broad Street
11          28th Floor
            Avenue of the Arts
12          Philadelphia, Pennsylvania 19109
            215-772-7228
13          FAX 215-772-7620
            jboughrum@mmwr.com
14          Representing the Defendant
15
16
17                       - - -
18
19
20
21
22
23
24
```

### Page 3

```
1                          - - -
2                     I N D E X
3                          - - -
4
5   Testimony of JOHN W. DIECKMAN, MS, CRC, CDMSC
6
7   EXAMINATION                              PAGE
8       BY  Mr. Boughrum                       4
9       BY  Mr. Frankel                       29
10      BY  Mr. Boughrum                      34
11
12
13
14
15                    - - -
16              E X H I B I T S
17                    - - -
18
19  EXHIBIT NO.        DESCRIPTION            PAGE
20  Dieckman-1         Curriculum Vitae       5 - 9
21  Dieckman-2         Expert Report, 12-12-14  10 - 30
                                              36 - 38
22
23
24
```

### Page 4

```
1   TESTIMONY OF JOHN W. DIECKMAN, MS, CRC, CDMSC
2                    - - -
3           It is hereby stipulated and agreed by and
4   between counsel for respective parties that,
5   signing, sealing, filing, and certification are
6   waived and that all objections, except as to the
7   form of the questions, be reserved until the
8   time of trial.
9                    - - -
10          JOHN W. DIECKMAN, MS, CRC, CDMSC, after
11  having been duly sworn was examined and
12  testified as follows:
13                   - - -
14      (Exhibits Dieckman-1 and Dieckman-2 marked
15  for identification.)
16                  - - -
17              EXAMINATION
18                  - - -
19  BY MR. BOUGHRUM:
20  Q.    Good morning, Mr. Dieckman.
21  A.    Good morning.
22  Q.    My name is Jonathan Boughrum.  I represent
23  LaSalle University.
24        Sir, I've seen on your CV, which we're going
```



JOHN W. DIECKMAN, MS, CRC
GORDON vs. LA SALLE UNIVERSITY

January 15, 2015
5–8

Page 5

1  to talk about in a second, that you have extensive
2  experience as a witness in offering testimony, including
3  depositions; is that correct?
4  A.      That's correct, I do.
5  Q.      Then I can abbreviate the initial comments I
6  typically offer in a deposition.
7  A.      Certainly.
8  Q.      Generally you have just sworn an oath to tell
9  the truth.
10           If you do not understand my question, please
11  ask me.
12  A.      Sure.
13  Q.      If you would like clarification, let me know.
14  A.      Okay.
15  Q.      If you do not seek such clarification, I will
16  assume and the record will reflect that you understood
17  the question and responded truthfully.  Okay?
18  A.      That's fine.
19  Q.      Handing you what I have marked as Dieckman-1,
20  would you please review that document.
21  A.      Yes.
22           This is a copy of my curriculum vitae.
23  Q.      Thank you.
24           Is the information contained in your CV

Page 6

1  accurate and current?
2  A.      It is, yes.
3  Q.      Thank you.
4           Now, if you could skip to the section dealing
5  with your testimony in the last four years.
6  A.      Yes, certainly.
7  Q.      There's a lot here.
8  A.      Yes.
9  Q.      Can you tell me generally the categories of
10  cases that these depositions fall into?
11  A.      I would estimate probably 85 percent of them are
12  in Workers' Compensation matters.  In those Workers'
13  Compensation matters, I do testify live in court, but
14  that's infrequently done these days.  There's been a
15  change in the Workers' Compensation law, et cetera.
16  However, there are some times when I've testified live in
17  matters of personal injury or wage loss liability, that
18  sort of thing.  That's not been the most of my testimony;
19  it seems like most of these cases seem to resolve before
20  court.
21           But I probably testified, I would imagine,
22  over the past five years maybe four or five times in
23  court on personal injury cases.  That's an estimate; I
24  haven't looked at this in detail.

Page 7

1  Q.      And when you say testimony, you're referring to
2  testimony at trial as opposed to testimony in a
3  deposition?
4  A.      Yes.  That's correct.
5  Q.      Now, how many of these cases deal with
6  disability accommodation issues?
7  A.      I'm going to be at a disadvantage because I
8  haven't looked at them one by one.
9  Q.      That's okay.  Go ahead.  Take your time.
10  A.      Give me a second here, if you would, please.
11  Q.      That's fine.
12  A.      (Examining the document).
13           Disability accommodation issues...
14           My recollection is that there is only one
15  actual -- well, the Workers' Compensation issues don't
16  deal with disability accommodation issues except in very
17  odd cases.  So for the most part, it's really just
18  personal injury and liability cases.
19           There's one on here I think I believe I
20  recall I gave live testimony in Philadelphia court in
21  2012, and I believe that that was an accommodation for
22  disability.
23  Q.      Which case is that?
24  A.      It's at the bottom of the page which says 212.

Page 8

1  My recollection is, and I hope that this is correct, the
2  case is called Hamidullah, H-A-M-I-D-U-L-L-A-H.  I
3  believe that that was a question of accommodation.
4           And I honestly -- I can't remember which
5  other ones were or were not.
6           That's my only recollection.  I've done
7  some -- I prepared some defense testimony for the defense
8  for a university, I'm going to recall it was West Chester
9  University, I believe several years ago.  I never gave
10  testimony on it but I prepared an expert report for the
11  defense with regard to an accommodation in an educational
12  matter.
13  Q.      West Chester University, what was the name of
14  that case?
15  A.      I don't recall.  And it's not on here because I
16  never actually testified on it; I just did an expert
17  report on it.
18           I could probably get it for you at another
19  time, but I don't have it right now.
20  Q.      Do you remember what year it was?
21  A.      No.  My recollection is it was approximately
22  three to four years ago.
23  Q.      Was it state court or federal court?
24  A.      It was slated for federal court, if I recall

JOHN W. DIECKMAN, MS, CRC
GORDON vs. LA SALLE UNIVERSITY

January 15, 2015
9—12

Page 9

1  correctly; but, as I said, it resolved.
2          My recollection is that they -- that the
3  plaintiff never sufficiently proved the liability issue
4  and therefore it was actually dismissed without ever
5  actually going to trial.
6  Q.     But you issued a written expert report in that
7  case?
8  A.     I did, yes.
9  Q.     Do you remember what the disability
10  accommodation issue was in that case?
11  A.     Let me think...
12          No, I don't remember clearly enough to tell
13  you that.
14  Q.     And how about in the Hamidullah case, do you
15  remember what the disability accommodation issue was
16  there?
17  A.     Not specifically, no.  It was -- no, I don't
18  specifically remember what that case was about.
19  Q.     Can you tell me what do you perceive to be your
20  purpose in Amber Gordon's lawsuit against LaSalle
21  University?
22  A.     My purpose is simple.  I'm trying to put a
23  dollar figure on her personal losses, financial losses,
24  if she is unable to complete the Master's Degree, looking

Page 10

1  at her present education, her opportunities, the income
2  that that would necessarily provide in comparing it with
3  income if she were to obtain a Master's Degree or
4  possibly a greater degree.
5  Q.     Thank you.
6          Have you been asked to prepare or are you
7  planning to prepare a supplemental report for this case?
8  A.     No, I'm not.
9  Q.     We're going to move to your report now.
10          I'll hand you what's Dieckman-2.
11  A.     Yes.
12  Q.     Please take a moment to look at that.
13  A.     Yes, this is my report.  Authored December 12,
14  2014.
15  Q.     Have you rendered opinions in your role as Amber
16  Gordon's expert witness which are not contained within
17  that report?
18  A.     No, I have not.
19          MR. BOUGHRUM:  Hang onto that.  We're
20          going to go through it in a little bit.
21          THE WITNESS:  I'm going to use my copy if
22          that's all right.
23          MR. BOUGHRUM:  That's fine, sure.
24  BY MR. BOUGHRUM:

Page 11

1  Q.     Now, in your report, you have a section titled
2  Review of Records.
3          Can you please tell us all of the materials
4  you relied upon in reaching your opinions which are
5  reflected in Dieckman-2.
6  A.     The records that I reviewed -- and bear with me,
7  let me find that page -- the records that I reviewed are
8  listed here.
9          I don't have any other records other than
10  that which was specified here.  The information which I
11  gathered with regard to wages and things like this comes
12  from government statistics which are cited in the back,
13  so they're not here as a record review, but these are the
14  only records that I reviewed for this purpose.
15  Q.     The reason I asked is because at the top it says
16  including but not necessarily limited to the following,
17  so I wanted to identify if there were additional records.
18  A.     Yes, it's a standard phrase I put in in the
19  event that sometimes I might have accidently not included
20  something.  But to the best of my knowledge, it's
21  complete.
22  Q.     How about Amber Gordon's deposition testimony,
23  have you reviewed that?
24  A.     I have not.

Page 12

1  Q.     Have you reviewed the deposition testimony of
2  any of the other witnesses in this case?
3  A.     I have not.
4  Q.     Have you reviewed the report issued by Amber
5  Gordon's Lyme disease expert, Dr. Spreen?
6  A.     Only the one that is cited here.
7          Spreen, I'm sorry?
8  Q.     Correct.
9  A.     No, I have not seen a report from Spreen.
10  Q.     Was there any information you requested from
11  Amber or her counsel that was not provided for you?
12  A.     No.  I will tell you that there has been an
13  exchange of e-mails between Amber and myself over the
14  past day or so, and I'm -- I was asking for some estimate
15  with regard to the potential costs for her if she would
16  need to redo all of her efforts to obtain another
17  Master's Degree.  That was the nature of the e-mails.
18  And to confirm the medical information here that with
19  proper treatment, she could conceivably recover from the
20  effects of this Lyme disease within a year.  And that's
21  quoted in one of the medical reports, sir.
22  Q.     And what did Amber tell you about the costs she
23  would incur to redo the efforts for her Master's Degree?
24  A.     Let me get my e-mails, if I could.



Case 2:14-cv-03056-JFL   Document 47-2   Filed 04/15/15   Page 38 of 51

JOHN W.  DIECKMAN, MS, CRC                                    January 15, 2015
GORDON vs. LA SALLE UNIVERSITY                                        13—16

Page 13

1          This came from actually her mother because I
2   cc'd them both, and the response was from Leigh Gordon,
3   her mother, who evidently for some reason she was the one
4   who was able to provide information.  She estimated it
5   would take two to four years to replicate that Master's
6   Degree program and costs $43,000 in tuition plus their
7   living expenses, which she estimated at $34,000.
8   Q.      Per year or total?
9   A.      No, total.
10  Q.      And how much was the living, I'm sorry?
11  A.      $34,000.  Whereas the educational expenses would
12  be -- she said, and I quote, she spent approximately
13  $43,000 on tuition and other educational expenses at
14  LaSalle.  So I'm assuming that that would be a number to
15  replicate her Master's Degree efforts.
16  Q.      It's my understanding from reading your report
17  that it is your opinion that if Amber does not complete
18  her Master's Degree at LaSalle University in the Marriage
19  and Family Counseling program, she will suffer an annual
20  loss of earnings equivalent to $21,370; is that
21  accurate?
22  A.      That's my calculation, yes.
23  Q.      However, if she obtains her Master's Degree, she
24  would not suffer that loss, correct?

Page 14

1   A.      That's correct.
2   Q.      Isn't it also true that if Amber were to obtain
3   a Master's Degree from another university, she would not
4   obtain that loss or she would not suffer that financial
5   loss?
6   A.      It's true that there's -- if she were able, and
7   I don't want to use the word willing, but perhaps just
8   say capable of going on to pursue another Master's
9   Degree, at a time when she received that, she would have
10  no wage loss.
11  Q.      And let's talk about Amber's current ability.
12          What is your understanding of Amber's current
13  treatment for her Lyme disease and her prognosis for
14  recovery?
15  A.      The treatment, and I tried to make this as
16  extensive as possible, I have quite a bit of information
17  with regard to not just a history of it but her current
18  treatment as it relates to the various physicians, this
19  appears on page 6 of my report, she's seeing Dr. Howard
20  Horne in Bethlehem, and he seems to be for cystoscope,
21  cystoscopic, and related issues.
22          Kerin Slevin for pain management whom she's
23  seen off and on for several years.
24          Of course, Dr. Lee Osterman for orthopedic

Page 15

1   issues related to her left shoulder.
2          Dr. Frieman of the Rothman Institute, also
3   for orthopedic issues.
4          Heidi Wittels is the one who is currently
5   treating her for Lyme disease.  And I quote Dr. Wittels
6   as saying that with proper treatment, she may be able to
7   recover and resume her normal lifestyle within
8   approximately one year.  And that's the figure that Amber
9   gave me also.
10          She's also treating, of course, with Rebecca
11  Nice, her family physician.
12  Q.      And am I correct that Dr. Wittels' prognosis of
13  potential recovery in a year is just that, it's a
14  potential, it's not a certainty that she can recover in a
15  year's time?
16  A.      That is correct.
17  Q.      So it may be that Amber will not in a year be
18  able to return to pursuing her Master's Degree?
19  A.      It's true, it's a medical opinion; and I
20  couldn't, you know, vouch one way or the other for it,
21  but it's a possibility.
22  Q.      And setting aside the potential limitations by
23  the ongoing Lyme disease, is there any other issue or any
24  other reason that Amber could not pursue a Master's

Page 16

1   Degree at a different university?
2   A.      It's a difficult question.
3          On the surface it would appear to be no, the
4   answer to that would appear to be no.
5          What she told me in the course of my
6   interview with her is that she's been very emotionally
7   deflated by this entire process.  She's obviously
8   invested quite a bit of not just money but her personal
9   energy into this process.
10          I actually inquired if it did not go well
11  whether or not she felt that she would go on for another
12  Master's Degree, and she honestly said I couldn't be
13  certain that I would.
14          So I'm trying to account for the
15  constellation of physical and psychological issues,
16  including the drain of attempting to do such a program
17  and failing to do it.  I can't therefore say that she
18  could not do it, but there are probably more than --
19  there's probably more issues than simply the Lyme disease
20  which would militate against that, and one of them being
21  the very stressful but unsuccessful attempt to do it at
22  LaSalle.
23          So the answer to your question is it's
24  conceivable that she could do it.  Having been through



JOHN W. DIECKMAN, MS, CRC
GORDON vs. LA SALLE UNIVERSITY

1  this difficult experience, it's not as automatic an
2  answer that she automatically would do it.
3  Q.      And it's true that Amber could pursue a
4  different career course and educational path at a
5  different university, correct?
6  A.      Oh, it's possible.
7  Q.      And that could lead to any level of future
8  income, correct?
9  A.      It's possible, yes.
10  Q.      And given the difficulties Amber is currently
11  suffering with her Lyme disease and based on the
12  information you've just cited from her doctors, you
13  would agree with me that Amber isn't currently
14  suffering an earnings loss because she couldn't complete
15  the Master's program at this time?
16  A.      Correct.
17        When I did my projections with regard to her
18  wage loss, I took it from a current date, not knowing
19  whether she would in fact be able to effectively work for
20  the next year or so.
21        There's also a possibility that had this been
22  successful somewhere in the past that she could have, she
23  was only really several months from obtaining a Master's
24  Degree in 2013, and I recognize that there's a certain

1  period of instability where I can't say that she would
2  have had earning capacity, but it's possible that she
3  could have had she been able to achieve a Master's Degree
4  at that time.
5        So there's probably, as I look at my figures,
6  I have a total figure of $861,000 I believe it is for
7  wage loss, and that basically -- bear with me a second,
8  let me get those figures precisely for you -- an annual
9  wage loss of $21,370 which is projected from her current
10  age, which is 26.71 years, forward through full
11  retirement at age 67, for a total of $861,000 of total
12  lost earnings.
13        I admit that there's probably a year, maybe a
14  little bit more where that's in flux and she may actually
15  not suffer an entire year of earning. It probably could
16  be more correctly calculated for another year or year and
17  a half from now.
18        And I'm trying to -- as I'm trying to put --
19  if I can extrapolate for a second -- I'm trying to put a
20  solid figure on this, and there's a lot of ambivalence
21  over the course of the next year whether she could work
22  and how much she could earn, et cetera, et cetera, okay.
23  I counteract that by recognizing that at one point she
24  said to me, she said her long-term goal is to be a

1  licensed psychologist, which is an entire, not just an
2  educational degree and a license but also an entire
3  nother earning capacity, it's probably, according to the
4  Bureau of Labor Statistics, about $85,000 a year as a
5  licensed psychologist.
6        So what I'm trying to do is be a little less
7  speculative in not allowing for that figure because that
8  would make any discussion of wage loss so much less
9  likely, less probable, and really the numbers would
10  become less solid.
11        So my intent in this is to try to portray an
12  accuracy with regard to what she would lose and over what
13  period of time she would lose it, recognizing that there
14  are all kinds of variabilities over the course of her
15  entire work-life, some of them good, some of them bad.
16  So it's a number that I feel is conservative but
17  accurate, but I admit that there's probably a year in
18  there that she may not be able to work, so you could
19  probably deduct $21,000 or a little bit more from that.
20  There's really no way to quantify that in any specific
21  way that I know of.
22  Q.      And you would agree, I think we just went over
23  this a minute ago, that it might be more than a year, the
24  reality might be that this Lyme disease is never

1  sufficiently treated to the point where Amber can go
2  forward, finish her Master's Degree and earn that income,
3  correct?
4  A.      Well, all I can say is that the medical
5  information from her treating physician is that it could
6  be corrected within a year. I guess it's always a
7  possibility. I'm not really a medical person, so I can't
8  say that, other than that it's a possibility.
9  Q.      And, again, if she obtains a Master's Degree
10  elsewhere or pursues a different degree --
11  A.      Correct.
12  Q.      -- she won't suffer that wage loss?
13  A.      At the time when she obtains another degree, if
14  that does in fact happen, she'll have no wage loss from
15  that time forward. So if that were two to four years in
16  the future, she would have two to four years of this wage
17  loss plus obviously the educational expenses incurred to
18  replicate this attempt.
19  Q.      I want to talk a little bit about the portion of
20  your report which references Amber's application for
21  Social Security income.
22  A.      Yes. It's early on under Finances on page 3.
23  Q.      Yes, thank you.
24        Is it Amber who provided you with the



JOHN W.  DIECKMAN, MS, CRC
GORDON vs. LA SALLE UNIVERSITY

January 15, 2015
21–24

Page 21

1  information referenced in this section of your report?
2  A.    Yes, it is.
3  Q.    And what does she tell you about her efforts to
4  apply for Social Security income?
5  A.    Well, I asked her if she is receiving or has
6  applied for Social Security Disability, and her response
7  was that she doesn't have enough quarters to qualify for
8  Social Security Disability.  She does qualify for SSI,
9  Supplemental Security Income, and she has applied for it,
10  it was originally denied, and she is appealing this.
11        And more than that we did not discuss.  I
12  don't have any numbers or anything else associated with
13  that.
14  Q.    So SSI, does that stand for Supplemental
15  Security Income?
16  A.    It does, yes.
17  Q.    What must Amber demonstrate to be eligible for
18  SSI?
19  A.    I don't want to say exactly.  It's analogous to
20  Social Security Disability, the difference being if you
21  don't have a certain amount of money in Social Security,
22  you don't qualify for SSDI, Social Security Disability
23  Income.
24        She would need to be able to demonstrate

Page 22

1  under normal SSDI, and I can only say if it's analogous
2  that there would be an inability to work for a period of
3  at least twelve months and possibly greater, but at least
4  twelve months.
5  Q.    Have you reviewed Amber's application for SSI?
6  A.    No, no, I haven't seen it, I didn't ask to see
7  it, I only asked her at what stage it's in.
8  Q.    And I presume then that you did not review
9  Amber's appeal for SSI?
10  A.    I did not, no, I didn't see it.
11  Q.    Now, do I understand your eligibility discussion
12  of a moment ago to be that Amber would not be eligible to
13  receive SSI if she were earning income?
14  A.    There may be a limit to the income, and I don't
15  know what the limit is.  It has to do -- it's a medical
16  determination, but there's a financial element to it, and
17  I don't know what the financial limitation is.  You can
18  earn some income, but I don't know what the threshold is.
19  Q.    How does the potential of Amber receiving SSI
20  change the opinions you have issued in Dieckman-2?
21  A.    It doesn't necessarily change any of them.  SSI
22  is not by its nature going to be a determination of
23  lifetime disability.  That can change in a period of
24  twelve months.  It's really a forecast that you would be

Page 23

1  unable to work for the next twelve months and if
2  possible, she would have some income through SSI.  That's
3  so esoteric as to be unable to be factored into any
4  income discussion with regard to wage loss.  Whether she
5  would actually get SSI, what amount that would be, or how
6  would that impact on her earning capacity, they're
7  questions that are completely unknown.
8        So I didn't at all factor that in,
9  recognizing that it's too vague to be able to do that.
10  Q.    Well, if Amber is earning SSI, would you agree
11  with me that she would not be suffering any wage loss?
12  A.    Oh, not -- she would not -- she has a wage loss
13  based on her potential earning as a Master's in Family
14  Therapy with wages that I've calculated at $64,000 a
15  year.  I can't imagine she would have SSI in anywhere
16  near that amount.
17  Q.    Right.  But I guess my understanding of SSI
18  eligibility is that you're disabled and you can't do a
19  job.  So there seems to be a conflict between the idea of
20  being SSI eligible and otherwise being able to earn the
21  income you've set forth in your report.
22  A.    Well, it is; but if she were able to put this
23  together in such a way that she can work in a year or
24  whenever, she would obviously no longer be eligible for

Page 24

1  SSI but she would have income.  The question is, I can't
2  put that together in terms of the timeframe.
3  Q.    I understand.
4  A.    But you could easily give up SSI.
5  Q.    Right.  We don't know Amber's future, so you
6  can't do that.
7  A.    Sure.
8  Q.    My question was:  Would you agree with me that
9  there is a conflict between being gainfully employed as a
10  Master's level therapist and receiving SSI?
11  A.    Yes, correct, she would not be able to do both.
12  Q.    Now, you offer an opinion here that, and please
13  correct me if I misstate it, that LaSalle violated the
14  Rehabilitation Act by failing to grant Amber a medical
15  leave, which you deem to be a reasonable accommodation.
16        Did I accurately state your opinion?
17  A.    I think you're right, that's correct.
18  Q.    And on what do you base that opinion?
19  A.    Well, the opinion that there is -- bear with me,
20  let me find that reasonable accommodation section.
21        The opinion, and, of course, I'm not the one
22  making the legal argument, but the opinion is the basis
23  for part of this argument, and that is that there is a
24  section of the Rehabilitation Act, Section 504, which



Case 2:14-cv-03056-JFL   Document 47-2   Filed 04/15/15   Page 41 of 51

JOHN W. DIECKMAN, MS, CRC                                          January 15, 2015
GORDON vs. LA SALLE UNIVERSITY                                            25–28

Page 25

1  covers institutions which are receiving federal income
2  and make them eligible or it basically obligates them to
3  the same standards that someone who is under the ADA --
4  or the Rehabilitation Act of 1973. So my belief and the
5  assumption behind this entire lawsuit is that LaSalle
6  has an obligation to do this, which they have not
7  fulfilled.
8  Q.     So tell me why would a medical leave have been a
9  reasonable accommodation in Amber's circumstances
10  specifically?
11  A.     Why would it have been?
12  Q.     Correct.
13  A.     Because the duty to accommodate is something
14  which basically is something that the employer or an
15  institution has unless it violates them or poses an undue
16  hardship to them.
17          I can't see how the ability to grant her a
18  medical leave and extension, considering the money, time,
19  and energy she's invested in this program, would in any
20  way constitute a hardship for LaSalle University.
21          I think farther than being a hardship, it's
22  something that they probably could have done with
23  relative ease and made this entire thing go away.
24  Q.     And what would that accommodation have been?

Page 26

1  A.     At the time it would have been the ability to
2  allow her to take medical leave and then return to the
3  program.
4  Q.     If she were able to do so?
5  A.     If she were able to do so.
6  Q.     Any other accommodations you're referring to?
7  A.     Well, I don't know what specifically she might
8  not have needed, but it was obvious at that point she
9  needed some time to cope with her Lyme disease and to go
10  through the healing process for that, which she estimated
11  to be a year, but it might be more flexible, it might be
12  more than that.
13          So the accommodation, what she's looking
14  for is simply that extension to be able to treat and
15  then come back and resume once she's more able to do
16  that.
17  Q.     In the course of reviewing your materials for
18  this case and preparing your opinion, have you learned
19  about the accommodations that were offered by LaSalle to
20  Amber Gordon throughout her Master's program?
21  A.     Only the ones that are quoted in my report.
22  And that is they allowed her to leave one internship and
23  to resume another one. And at one point the SPEC
24  committee offered her the requirements that she complete

Page 27

1  two semesters of internship successfully to obtain the
2  Master's Degree.
3          They're the only ones that I'm aware of, and
4  it's quoted in e-mails that there are others, more
5  specifics I'm not aware of.
6          MR. BOUGHRUM: Let's take a break for five
7  minutes, Dave, if that's okay.
8          MR. FRANKEL: Sure.
9              - - -
10         (Off the record at 10:01 A.M.)
11             - - -
12         (On the record at 10:06 A.M.)
13             - - -
14         MR. BOUGHRUM: Back on the record.
15  BY MR. BOUGHRUM:
16  Q.     Mr. Dieckman, did you conduct any sort of
17  vocational testing for Amber Gordon?
18  A.     No, I didn't feel in any way it was necessary.
19  Her educational achievements are self-explanatory.
20  Q.     So you were not aware of what other jobs she
21  might be suited for or what the earning potential is for
22  those other alternative careers?
23  A.     That is correct. She currently has some earning
24  capacity of about $42,000 a year, which is fairly

Page 28

1  substantial. Most of the other positions would perhaps
2  equal or not even equal that.
3          I thought that her career track was very
4  good. Even if she doesn't go on and have a Master's
5  Degree, she has some earning capacity that is substantial
6  but not great. So I didn't feel that it would be
7  necessary to conduct -- to compare her with other types
8  of professions. To be honest with you, having looked at
9  them all, they would have offered probably less salary.
10  As a matter of fact, I shouldn't say probably, I know, I
11  know the salaries then probably come in probably
12  somewhere in the range of thirty-five to $40,000 a year
13  as typical work as a dispatcher, as a customer service
14  representative, supervisor, those types of things. The
15  $42,000 already exceeds most of what she would be able to
16  otherwise qualify for in the general labor market.
17  Q.     With her Bachelor's Degree?
18  A.     With her Bachelor's Degree, that's correct.
19  Q.     And as we said before, there's no telling what
20  additional education or job opportunities she may pursue
21  in the future?
22  A.     That's correct.
23  Q.     Last question about your engagement in this
24  matter by Ms. Gordon's counsel.



JOHN W. DIECKMAN, MS, CRC
GORDON vs. LA SALLE UNIVERSITY

January 15, 2015
29–32

Page 29

1    Can you tell me the fee structure for your
2 services here?
3 A.    I can only tell you what I believe it is.  I
4 believe it's $90 an hour.  And everything is billed
5 hourly from record review to driving to testimony,
6 everything is billed at the same rate, an hourly rate,
7 and I believe that rate is $90 an hour.
8    And I think at this point if you would ask me
9 what my total bill is, it's probably under twelve hours
10 at this point, ten to twelve hours perhaps, not even that
11 perhaps.
12    MR. BOUGHRUM:  Thank you, Mr. Dieckman.
13    I have no more questions.
14    THE WITNESS:  I'm sorry, you know, let me
15 take back that last statement.
16    In doing the report and traveling to
17 Amber's house and doing the research and stuff
18 like that, that report has probably generated
19 somewhere in the range of maybe 18 hours or
20 something like this.  In terms of preparation
21 for testimony and things like this, I'm sure I
22 have less than twelve hours today.
23    MR. BOUGHRUM:  Understood.
24    THE WITNESS:  Understood.

Page 30

1    MR. BOUGHRUM:  Thank you,
2    THE WITNESS:  I'm sorry, that was not
3 right.
4    MR. FRANKEL:  Just a couple of follow-up
5 questions.
6    THE WITNESS:  Yes.
7    - - -
8    EXAMINATION
9    - - -
10 BY MR. FRANKEL:
11 Q.    One is a follow-up to the question about if she
12 went back, started over, and got a Master's Degree
13 somewhere else.
14 A.    Yes.
15 Q.    So you had said that the tuition and so on would
16 be roughly $43,000?
17 A.    That is her family's estimate of what they've
18 already spent, so it would be a similar figure, yes.
19 Q.    And her living expenses were about $34,000?
20 A.    That's what they said, yes.
21 Q.    First of all, how long would it take for her to
22 get that degree if she started over?
23 A.    Her estimate is two to four years.
24 Q.    Would she lose, in addition to having to pay

Page 31

1 out money, would she be losing money during that time as
2 far as missed income?
3 A.    Well, it would be difficult.  What she did was
4 basically she left when her internship happened, in the
5 pursuit of her Master's Degree, she left her employment
6 so she could devote her time and energy to the
7 internship.
8    So while I give her an earning capacity of
9 $42,000 a year, that assumes that she's not actively
10 engaged in an educational process and she's working.
11    That would be offset obviously if she were to
12 go to the classes, she could conceivably work some time
13 as she did before, she worked two or three days a week
14 part time while going to classes.
15    So even then she really was not earning
16 anything close to $42,000 a year.  But once the
17 internship came, she felt that she needed to devote
18 herself to this, so she really didn't work at all.  So
19 her income's been very, very modest, which is probably
20 why she doesn't qualify for Social Security Disability.
21 She's not had much.
22 Q.    So she would be, in addition to paying out, she
23 would be losing some amount of income?
24 A.    Oh, correct.

Page 32

1    I wouldn't use -- if she were to engage in
2 say a three-year Master's program, I can't presume
3 that over that three years that she would be able or
4 capable of earning $42,000 a year as she would if she
5 were strictly devoted to, you know, the work project.
6 So she would be losing -- basically she would have a
7 total wage loss over the course of that time, if not
8 total, it would be near total wage loss over the course
9 of that time when she's in education.
10 Q.    And she would also have lost $43,000 and $34,000
11 from her time at LaSalle, correct?
12 A.    That's correct, yes.
13 Q.    And she also has lost time based on the
14 dismissal from LaSalle, lost time in terms of the
15 possibility of earning income; is that correct?
16 A.    She has.  There's been a whole disruption to her
17 career plans.
18 Q.    And has she indicated to you that she's not sure
19 she has the emotional strength to go back and start all
20 over rather than just finishing up?
21 A.    I asked her that question, and she said to me,
22 she said I can't be certain that this is what I want to
23 do.  She said what I want out of this lawsuit is simple,
24 I want my Master's in Family Therapy so I can pursue my

JOHN W. DIECKMAN, MS, CRC
GORDON vs. LA SALLE UNIVERSITY

January 15, 2015
33—36

Page 33

1  career.
2          And I asked her if she has alternative plans,
3  and she says no, I do not have an alternative plan at
4  this time.
5  Q.      As an expert in financial losses, if someone
6  were to get kicked out of a Master's program, start over,
7  get kicked out of the next Master's program, start over,
8  get kicked out of the third Master's program, and so on,
9  would their only losses be the tuition that they paid
10  during that time or would they actually be losing the
11  possibility of being an MFT?
12  A.      Sure.
13          I mean she could be actively employed
14  perhaps this year, perhaps in a year to come, she could
15  be actively employed with substantial earning capacity.
16          And the beauty of that particular job is she
17  really would have some ability to accommodate her
18  orthopedic limitations. She's not doing any significant
19  lifting, if she could control her driving, she could
20  really work within Dr. Osterman's limitations in that
21  particular career with that particular degree.
22          Without that she's -- she has a greater
23  difficulty. When she was a wraparound, for example, she
24  had to refuse certain cases because she simply can't deal

Page 34

1  with aggressive or hostile children or anything that
2  would need physical demands, she really couldn't do that.
3  So she really has some limitations not related at all to
4  this lawsuit, but they're her orthopedic limitations that
5  the Master's in Family Therapy could have really
6  rectified in many different ways.
7  Q.      So do these numbers that were quoted reflect any
8  of her lost time, her emotional damages --
9          MR. BOUGHRUM: Objection to form.
10          MR. FRANKEL: -- from this dismissal?
11          You can answer.
12          THE WITNESS: They don't. They don't.
13          And there's no way for me to put a
14          dollar figure on that or calculate it, so I
15          tried to use something that seems the most
16          objective and the easiest to substantiate.
17  BY MR. FRANKEL:
18  Q.      And final question.
19          Your estimates here, were they, would you say
20  on a scale of one to ten, one being very, very
21  conservative and ten being very, very aggressive, where
22  did you try to put these numbers?
23  A.      I'm trying to be conservative and I'm trying to
24  use Bureau of Labor Statistics in a way that seems

Page 35

1  appropriate, so therefore I have to be conservative with
2  it.
3          I've been up against other experts and they
4  have imagined three-year-olds who would go on to obtain a
5  doctorate degree and come up with huge numbers of wage
6  loss, and there's really no substantiation for that.
7          Amber expressed an idea that she would like
8  to be a licensed psychologist at some point. It's not
9  something that I incorporated into my goal. That would
10  give you a huge wage loss, well over a million dollars if
11  you would compare her current earnings at $42,000 with
12  something about $84,000 a year like a licensed
13  psychologist.
14          So I'm trying to be more conservative. I put
15  my number in around a three in terms of being absolutely
16  more conservative. I'm trying to think if I could be
17  more conservative...
18          As I discussed, I probably would have lost a
19  year from that. In reflection there's probably an
20  argument to be made that she would miss a year of that.
21          That aside, I think it's a pretty
22  conservative number.
23          MR. FRANKEL: No further questions.
24          MR. BOUGHRUM: I have one followup.

Page 36

1              -  -  -
2          EXAMINATION
3              -  -  -
4  BY MR. BOUGHRUM:
5  Q.      Do you still have your report handy?
6  A.      I do.
7  Q.      Deickman-2.
8  A.      Yes.
9  Q.      Can you flip to the section titled Residual
10  Employability/Finances and go to the next page, first
11  paragraph.
12  A.      Page 17.
13  Q.      So the paragraph at the top of this page which
14  starts If she were to obtain a Master's Degree, I'm going
15  to read this.
16          If she were to obtain a Master's Degree in
17  Marriage and Family Therapy, she would be eligible to
18  work for an agency such as the Penn Foundation or Aldie
19  Counseling, where she could be an employee or an
20  independent practitioner charging a fee for service. In
21  my presence, Amber Gordon contacted several of her
22  friends who are successful in completing the Master's
23  program to determine their salary range. One friend
24  currently working in a fee-for-service capacity for Aldie



JOHN W. DIECKMAN, MS, CRC
GORDON vs. LA SALLE UNIVERSITY

January 15, 2015
37–40

Page 37

1  Counseling is earning $28.75 per hour.  Another friend at
2  the Penn Foundation has recently become an employee at a
3  salary of $41,000 annually plus benefits.
4        Did I read that accurately?
5  A.      You did.  That's correct.
6  Q.      So this is a friend of Amber's who does have the
7  Master's Degree but she still only earns $41,000 a year,
8  correct?
9  A.      Correct.  And this is someone who, my
10  understanding is, who just recently obtained this job.
11  As a matter of fact, I'm almost positive that that's the
12  qualification, she recently obtained it.
13        And the reason I put in plus benefits is that
14  there is a percentage of your salary that you have to
15  calculate when you receive benefits.  If you're an
16  independent-fee-for-service practitioner, you're not
17  likely to be getting benefits.  So there's probably maybe
18  a 20 to 22 percent benefit with medical benefits that is
19  over and on top of your salary.
20        And the other reason I put $41,000 there is
21  to show that if I would show that she has a $42,000
22  earning capacity with her current level of education,
23  that's generous.  There is someone with a Master's Degree
24  who is only earning $41,000 with benefits.  But I

Page 38

1  recognize that that person is just newly into that job.
2  Q.      That's my point, that the reality is that Amber,
3  even with her Master's Degree might have a starting
4  salary at Penn Foundation of forty-one thousand plus
5  benefits, correct?
6  A.      It's a point that it could be as low as $41,000,
7  and there is a point of getting into your profession and
8  securing yourself and growing in it, and it doesn't
9  happen generally in the initial first couple of years but
10  it could happen and could happen well beyond that.
11        So when I have divergent figures like this,
12  what I have to do is I have to go to something that is a
13  little bit more authoritative where I use the Bureau of
14  Labor Statistics.  But I recognize that even with the
15  Bureau of Labor Statistics, that is a mean annual.  There
16  are individuals earning more and less, and so I'm using
17  something which is an accepted figure knowing that
18  basically newly hired employees are kind of all over the
19  place.
20        MR. BOUGHRUM:  Understood.
21        Thank you.
22        No more questions.
23        MR. FRANKEL:  All done.
24        COURT REPORTER:  Counsel, are both of you

Page 39

1  ordering the transcript?
2        MR. BOUGHRUM:  Yes.  Actually, can I have
3  a rough as soon as possible, please?  I have a
4  motion due next week.
5        MR. FRANKEL:  E-mail and mini.
6        COURT REPORTER:  Do you need a rough also?
7        MR. FRANKEL:  No.
8        Thank you.
9           -  -  -
10        (Deposition concluded at 10:20 A.M.)
11           -  -  -
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 40

1              C E R T I F I C A T I O N
2
3
4        I hereby certify that the proceedings and
5  evidence are contained fully and accurately in the notes taken
6  by me on the trial of the above cause, and this copy is a
7  correct transcript of the same.
8
9                    _____
                     MARGARET M. KANYUK, R.M.R.
10                   Official Court Reporter
11           -  -  -
12
13        (The foregoing certification of this
14  transcript does not apply to any reproduction of the same by
15  any means unless under the direct control and/or supervision
16  of the certifying reporter.)
17           -  -  -
18
19
20
21
22
23
24



**EXHIBIT C**

SSD Application Summary
[redacted]

July 25, 2013, 07:25
PAGE   1

NH 

SG-SSA-16

```
: ------------------------- :
: UNIT: INTINT           :
:                        :
:                        :
:                        :
:                        :
:                        :
: ------------------------- :
```

AMBER LYN GORDON
269 MIDDLE PARK DRIVE
SOUDERTON PA 18964

APPLICATION SUMMARY FOR DISABILITY INSURANCE BENEFITS

On July 25, 2013, we talked with you and completed your application for SOCIAL
SECURITY BENEFITS. We stored this information electronically in our records. We
are enclosing a summary of your statements.

I APPLY FOR A PERIOD OF DISABILITY AND/OR ALL INSURANCE BENEFITS FOR WHICH I AM
ELIGIBLE UNDER TITLE II AND PART A OF TITLE XVIII OF THE SOCIAL SECURITY ACT,
AS PRESENTLY AMENDED.

MY NAME IS AMBER LYN GORDON.

MY SOCIAL SECURITY NUMBER IS ▮▮▮▮▮▮▮▮.

MY DATE OF BIRTH IS March 29, 1988.

I AM A CITIZEN OF THE UNITED STATES.

I BECAME UNABLE TO WORK BECAUSE OF MY DISABLING CONDITION ON June 1, 2012.

I AM STILL DISABLED.

A PREVIOUS APPLICATION HAS BEEN FILED WITH THE SOCIAL SECURITY ADMINISTRATION
BY OR FOR ME.

I DO NOT WANT TO FILE FOR SSI.

I HAVE NOT FILED NOR DO I INTEND TO FILE FOR ANY WORKERS' COMPENSATION, PUBLIC
DISABILITY OR BLACK LUNG BENEFITS.

I AM NOT ENTITLED TO NOR DO I EXPECT TO BECOME ENTITLED TO A PENSION OR ANNUITY
BASED IN WHOLE OR IN PART ON WORK AFTER 1956 NOT COVERED BY SOCIAL SECURITY.

THE SOCIAL SECURITY ADMINISTRATION AND THE STATE AGENCY REVIEWING MY CLAIM DO
HAVE MY PERMISSION TO CONTACT MY EMPLOYER(S).

I NEVER MARRIED OR I HAD NO PREVIOUS MARRIAGES THAT LASTED 10 YEARS OR MORE OR
ENDED IN DEATH.

**D000925**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

AMBER GORDON

            Plaintiff,

       v.

LA SALLE UNIVERSITY

            Defendant.

Civil Action No:  14-cv-3056-JFL

---

## REPLY MEMORANDUM IN SUPPORT OF DEFENDANT LA SALLE UNIVERSITY'S MOTION TO EXCLUDE THE REPORT OF JOHN W. DIECKMAN

Defendant La Salle University ("La Salle"), by counsel, hereby submits the following Reply Memorandum of Law in support of its Motion to Exclude the Report of John W. Dieckman ("Motion").

### I.     INTRODUCTION

On January 23, 2015, La Salle filed its motion to exclude from evidence at trial the report of John W. Dieckman ("Report"), Plaintiff's purported expert witness on wage loss.  La Salle requested that the Dieckman Report be excluded because (1) it contained impermissible legal conclusions, and (2) its economic projections were based upon speculation and contradicted by evidence of record, including the Dieckman Report itself.

Plaintiff has agreed that Dieckman's legal conclusions should not be admissible into evidence at trial.  However, Plaintiff argued in response to the Motion that Dieckman's economic projections satisfied the applicable law and were based upon proper facts.  Plaintiff's argument misstates the facts of record and the opinions offered by Dieckman in his Report.  Simply put,

Plaintiff's argument that Dieckman's assumptions about Plaintiff's future wage-loss are "well grounded in presently-known facts" (Pltf. Br. Opp., p. 5) is wrong.

## II.   ARGUMENT

### A.   <u>Admissibility of Expert Testimony Regarding Wage Loss.</u>

The district court must decide whether the proffered expert testimony "is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 591 (quoting *United States v. Downing*, 753 F.2d 1224, 1242 (3d Cir. 1985)); *see also General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert").

The party proffering expert testimony bears the burden of demonstrating "by a preponderance of proof" that the testimony at issue satisfies the requirements of Rule 702. *Oddi v. Ford Motor Co.*, 234 F.3d 136, 144 (3d Cir. 2000) (quoting *Daubert*, 509 U.S. at 593 n.10). This Court has broad discretion to exclude improper expert testimony under Rule 702 and the *Daubert* standard. *See, e.g., Joiner*, 522 U.S. at 142.

When an expert testifies as to ongoing wage loss, his opinions must be based on a firm factual foundation. *Gumbs v. International Harvester, Inc.*, 718 F.2d 88, 98 (3d Cir. 1983). An expert's unrealistic extrapolation of the plaintiff's future wages without any factual backing is similarly insufficient. *Benjamin v. Peter's Farm Condominium Ass'n*, 820 F.2d 640, 641 (3d Cir. 1987). This form of expert opinion must meet the requisite levels of proof in order to present an "accurate and complete appraisal" of the plaintiff's alleged future earnings and how her injury, if any, may impact them. *Heckman v. Federal Press Co.*, 587 F.2d 612, 618 (3d Cir. 1978). While this is a fact specific inquiry, the case law of the Third Circuit is clear that an

economic expert must base his opinion regarding loss of future wages upon a firm factual

foundation and that wild speculation will not be sufficient.

**B.      The Factual Record and Dieckman's Own Report Contradict the Purported Expert Opinions to be Offered at Trial.**

Dieckman opines that Plaintiff has and continues to suffer a wage loss, and will suffer a

lifetime wage loss due to her failure to obtain a Master's degree from La Salle.  Dieckman offers

such opinions despite the evidentiary record and his own Report which provide the following:

- Plaintiff is not presently able to work and no one knows when, if ever, Plaintiff may be able to return to work.  (Dieckman Dep. 17:10-16; 19-20:22-8, attached to Motion as Exhibit B; Dieckman Report at 18, attached to Motion as Exhibit A.)
- In support of her pending appeal of her claim to obtain Social Security Disability benefits, Plaintiff has sworn under penalty of criminal prosecution that she has been unable to work since June 1, 2012.  (SSD Application Summary at 1-2, attached to Motion as Exhibit C.)
- Plaintiff is not presently able to attend school and no one knows when, if ever, Plaintiff may be able to return to school. (Dieckman Report at 18, attached to Motion as Exhibit A; Dieckman Dep. 17:10-16; 19-20:22-8, attached to Motion as Exhibit B.)
- If Plaintiff one day returns to school, she may pursue any number of career paths with varying incomes, and as a result Plaintiff may suffer no actual wage loss due to the lack of a Master's degree from La Salle.  (Dieckman Dep. 14:2-10, 17:3-9, 28:19-22, attached to Motion as Exhibit B.)
- According to Dieckman's Report and analysis, even if Plaintiff had earned her Master's Degree from La Salle, she may earn less than the non-Master's-level salary identified by Dieckman, meaning Plaintiff would suffer no actual wage loss due to the lack of a Master's degree.  (Dieckman Report at 17, attached to Motion as Exhibit A; Dieckman Dep. 38:2-6, attached to Motion as Exhibit B.)

Given the foregoing evidence of record and the contradictory statements within the

Dieckman Report, it is impossible to conclude that Dieckman's Report is anything other than

speculation.  Accordingly, the Report and testimony of Dieckman must be deemed inadmissible

at the trial of this action.

## IV.    CONCLUSION

For the reasons set forth above, this Court should exclude Mr. Dieckman's Report as it does not meet the Fed. R. Evid. 702 or *Daubert* requirements.


Respectfully submitted,

Dated: February 13, 2015

/s/ J. Boughrum
Daniel P. O'Meara (PA ID 53535)
Jonathan Boughrum (PA ID 91019)
Chad A. Flores (PA ID 310610)
Montgomery McCracken Walker & Rhoads LLP
123 South Broad Street, 28th Floor
Philadelphia, PA 19109
Telephone: (215) 772-1500
Fax: (215) 772-7620
domeara@mmwr.com
jboughrum@mmwr.com
cflores@mmwr.com
*Attorneys for Defendant*

-4-

## CERTIFICATE OF SERVICE

I hereby certify that on February 13, 2015, I caused a true and correct copy of the

foregoing *Reply Memorandum in Support of Defendant La Salle University's Motion to Exclude*

*the Report of John W. Dieckman* to be served via e-mail on the following:

David Frankel
Frankel Kershenbaum
1230 County Line Road
Bryn Mawr, PA 19010
dave@mykidslawyer.com
*Attorneys for Plaintiff*


 s/ JP Boughrum
Jonathan P. Boughrum